959 F.2d 1194
 22 Bankr.Ct.Dec. 1309, Bankr. L. Rep. P 74,353
 MARITIME ELECTRIC COMPANY, INC., A New York Corporation,
v.
UNITED JERSEY BANK, A New Jersey Banking Corporation;
Michael Gill; and Maritime Electric Company,
Inc., A New Jersey Corporation.
Michael GILL, Third-Party Plaintiff,
v.
MARITIME ELECTRIC COMPANY, INC., A New York Corporation;
Thomas Gill, Individually and in his Capacity as
President of Maritime Electric Company,
Inc., (N.Y.), Third-Party Defendants,
Maritime Electric Co., Inc., (plaintiff and third-party
defendant) and Thomas Gill (third-party
defendant), Appellants.
 No. 90-6057.
 United States Court of Appeals,
Third Circuit.
 Argued June 12, 1991.
Decided Dec. 2, 1991.
Rehearing Granted; Opinion Vacated
Jan. 10, 1992.
Opinion Reinstated on Rehearing
March 24, 1992.
Rehearing Denied March 25, 1992.
 
 Samuel Feldman (argued), Orloff, Lowenbach, Stifelman & Siegel, Roseland, N.J., for appellants.
 Alexander W. Booth, Jr. (argued), Brownstein & Booth, Union City, N.J., for appellee, Michael Gill.
 Before: NYGAARD and ALITO, Circuit Judges, and FULLAM, District Judge.*OPINION OF THE COURT
 NYGAARD, Circuit Judge.
 
 
 1
 In this appeal arising from litigation between a father and son and their respective corporations, we address the scope and effect of the Bankruptcy Code's automatic stay provision, 11 U.S.C. § 362(a)(1), on the district court's judgment entered after the son filed a Chapter 13 petition in bankruptcy. We hold that any district court proceedings against the debtor-son that occurred during the son's bankruptcy are void ab initio; that the district court's July 16, 1990 judgment must be vacated accordingly; and, given the lack of a final order respecting appellant Maritime Electric Co.'s conversion claim against Michael Gill, we must dismiss for lack of appellate jurisdiction.
 
 
 2
 The district court had jurisdiction under 28 U.S.C. § 1332(a). We have inherent power and a continuing obligation to determine our own jurisdiction. See Shendock v. Director, OWCP, 893 F.2d 1458, 1461 (3d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 81, 112 L.Ed.2d 53 (1990); Thermice Corp. v. Vistron Corp., 832 F.2d 248, 251 (3d Cir.1987).
 
 I.
 A. Facts
 
 3
 At various times during the period 1975-1986, Thomas Gill ("Father") and Maritime Electric Co., Inc. ("MNY"), Father's New York corporation, employed Michael Gill ("Son"). Father was MNY's President. MNY was in the business of selling electrical equipment and parts to the marine industry. Albert Bishow was MNY's treasurer during the events described below.
 
 
 4
 At first, MNY employed Son as an outside salesman. Son was paid a weekly salary plus selling expenses. Then, pursuant to an oral agreement between Father and Son effective beginning May 1, 1979, Son was employed on a commission and monthly draw basis: he was entitled to commissions equal to 25% of MNY's gross profit margin on his sales, and to regular monthly draws against those commissions.
 
 
 5
 From 1979 until August 1984, Son's sales performance for MNY increased steadily. During this period, Son made repeated requests for an accounting and payment of all the commissions he earned, but Father made excuses and refused to comply. By and large, MNY paid Son monthly draws only which fell far short of the total commissions Son earned.
 
 
 6
 In 1979, when Son's sales for MNY were over $800,000, he received monthly draws of $2000 and one additional $2000 payment against the commissions outstanding. In 1980, when Son's sales were more than $1,000,000, Son received only monthly draws. Towards the end of 1980, Son's monthly draw was increased to $4000, but as the district court found "his requests for payment of accrued commissions were still being 'sandbagged' and he was told to wait".
 
 
 7
 Son's sales for MNY increased to approximately $1,500,000 in 1981, and to approximately $1,800,000 in 1982--but for each of these years Son received only $48,000 in monthly draws instead of his earned commissions which were $131,250 and $157,500, respectively. At the end of 1982, Father again refused Son's request for a comprehensive accounting and payment of all past due commissions. Nevertheless, Son continued to work for MNY.
 
 
 8
 In February 1984, when Son's sales for MNY had increased to approximately $2,200,000 out of the company's total sales of $2,831,000, Father told Son that the commission arrangement would be terminated and Son would be compensated on a salary plus expenses basis beginning March 1, 1984. Indeed, on that date the commission arrangement ended and Son began to receive a salary, but it amounted to $8000 less per year than the draws he had most recently been receiving. Furthermore, Son's past due commissions remained unpaid. When Son repeated his request for an accounting of the unpaid commissions, Father made assurances and referred vaguely to "corporate problems".
 
 
 9
 In May 1984, Son yet again requested an accounting, but this time Father said to forget the unpaid commissions. Son responded by suggesting that they agree to settle their commission dispute on some figure--$50,000, $20,000, or even $10,000but Father refused saying, "You got f____d. But at least you got f____d by someone you know. Don't let it happen down the road." Needless to say, the father-son relationship had wholly deteriorated.
 
 
 10
 In August 1984, Son filed a complaint against MNY in the Supreme Court of the State of New York, County of New York, seeking to recover the unpaid commissions. In response to Son's suit, Father terminated Son's employment with MNY.
 
 
 11
 In the spring of 1985, before discovery commenced in the New York litigation, Father asked Son to come back to work at MNY. Still refusing to pay the past due commissions, Father promised that if Son dropped the pending state court action: Son could come back as General Manager of MNY with authority over all of its business but not its general ledger; and, at the end of 1985, Father and Bishow would retire, Son would become President of MNY and he could buy Father's stake in the company. Father insisted, however, that no attorneys were to be involved in this proposed settlement.
 
 
 12
 Father reiterated the details of his proposal at a subsequent meeting with Son. But Father became indignant and emotional when Son asked that the proposed settlement be put in writing. Father said, "I promise you on the grave of my father who started the business.... [that I will keep my settlement promises]". The proposed settlement terms were confirmed at yet another meeting. Son finally accepted the settlement and agreed that it not be in writing.
 
 
 13
 When, as per their agreement, Son returned to work at MNY, he was introduced by his Father to the company's staff as "General Manager", "their boss". The following day, Son signed a Stipulation of Discontinuance of his New York suit with prejudice. Son also signed a general release in favor of MNY.
 
 
 14
 Later, in early December 1985, Father told Son he was no longer General Manager of MNY, he was demoted to MNY office manager, Father and Bishop were not retiring as promised, and "[t]here's nothing--no presidency, no nothing." Despite Father's breach of the settlement agreement, Son continued to work for MNY.
 
 
 15
 In February 1986, Son set up a New Jersey corporation named "Maritime Electric Company, Inc." ("MNJ"). He opened a bank account in New Jersey in the new corporation's name, which was identical to MNY's trade name.
 
 
 16
 Between July and November of 1986, while employed by MNY, Son took thirty-seven checks made payable to MNY and deposited them into his new corporation's account. He later withdrew the funds for his personal use. Thus, Son converted MNY funds totalling $111,725.09 because he felt he was entitled to them on account of the commissions still unpaid by MNY. Son's employment at MNY came to an end.
 
 
 17
 B. The federal litigation.
 
 
 18
 In June 1987, MNY filed a complaint in district court against Son and MNJ, alleging conversion, unjust enrichment, and fraudulent contraction of debt under N.J.S.A. 2A:26-2(a). MNY sought compensatory and punitive damages, interest, costs and, as provided by the New Jersey statute, prejudgment interest, attorneys' fees and a writ of attachment against Son's and MNJ's assets in New Jersey.
 
 
 19
 Son and MNJ answered MNY's complaint with several affirmative defenses and a jury trial demand. Additionally, Son asserted a counterclaim against MNY and a third-party complaint against Father, individually and in his capacity as President of MNY. The counterclaim and third-party action alleged inter alia that MNY and Father had breached Son's employment contract, and had fraudulently induced Son into settling his New York state suit against MNY. Son sought compensatory and punitive damages, interest and costs.
 
 
 20
 In July 1988, MNY moved for summary judgment on its conversion claims against Son and MNJ. On September 16, 1988, the district court ordered partial summary judgment in favor of MNY: a judgment against Son and MNJ, jointly and severally, awarding MNY $111,725 in compensatory damages together with prejudgment interest in the amount of $10,509.78, and imposing an equitable lien (for the same amounts) in favor of MNY on Son's real estate in Broward County, Florida. Nonetheless, the district court did not grant summary judgment on MNY's claim for punitive damages. See Partial Summary Judgment Opinion and Order of August 8, 1988; Final Partial Summary Judgment Order of September 16, 1988.[1]
 
 
 21
 On March 2, 1989, the parties entered into a Pretrial Stipulation and Order. They stipulated that Son's and MNJ's liability to MNY for conversion was not disputed because MNY had already established on its motion for summary judgment facts enough to support the conversion claim. However, the pretrial order provided inter alia that, for purposes of MNY's claim for punitive damages, a determination of law was required: "Whether Michael Gill's conduct in converting the 37 Maritime New York checks is so egregious and wanton that punitive damages should be assessed against him, and if so, the amount of such damages." The pretrial order provided too that, for purposes of determining whether punitive damages should be awarded, MNY would prove inter alia the following: "[t]he alleged commissions which were the basis of the New York action and the supposed justification for Michael Gill's conversion of Maritime NY checks did not exist"; "Thomas Gill did not promise Michael Gill that he and Albert Bishow would retire at the end of 1985 and sell Michael Gill their stock at the end of 1986"; and "Michael Gill's claim that he was entitled to the checks that he took from Maritime NY is merely after-the-fact justification for his illegal acts."
 
 
 22
 For purposes of Son's counterclaim and third-party action against MNY and Father, the pretrial order provided that MNY and Father would prove, inter alia, with regard to damages and liability that:
 
 
 23
 Throughout his employment by Maritime NY, Michael Gill repeatedly and regularly complained about his compensation and demanded that Thomas Gill turn over his stock to Michael Gill as the latter was better qualified to run the corporation.... There was no commission agreement that could be enforced in the New York Action.... The New York action was settled because Thomas Gill offered to give Michael Gill his old job, which Michael Gill accepted.... Although Thomas Gill hoped that his son would ultimately take over Maritime NY, Thomas Gill did not promise Michael Gill that he and Albert Bishow would retire at the end of 1985 or that he would sell his stock in Maritime NY at the end of 1986.... In October 1986, Thomas Gill, although under no obligation to do so, discussed with Michael Gill the possibility of Michael Gill becoming the president of Maritime NY. Thomas Gill did not proceed further with this offer because he discovered that Michael Gill had stolen over $100,000 from the corporation and had no desire to reward a thief, even if that thief was his son.
 
 
 24
 Thus, the pretrial order indicates that many of the proofs left for trial in MNY's conversion claim against Son and MNJ were the same factual issues to be tried in Son's counterclaim and third-party action against MNY and Father.[2]
 
 
 25
 On May 18, 1990, Son filed an individual voluntary Chapter 13 petition for bankruptcy relief in the United States Bankruptcy Court for the Southern District of Florida. Bankruptcy relief was ordered upon the filing. Until Son's bankruptcy case was dismissed with prejudice on September 25, 1990, MNY never sought relief from the automatic stay which was triggered by Son's bankruptcy filing.[3]
 
 
 26
 On the morning of trial, July 2, 1990, the parties waived their rights to trial by jury. Then, over July 2 and 3, the district court tried MNY's claim for punitive damages against Son and MNJ, and also Son's counterclaim against MNY and his third-party claim against Father.[4]
 
 
 27
 On July 16, 1990, the district court rendered judgment for Son and against MNY and Father on Son's counterclaim and third-party claim for unpaid commissions; and against MNY on its claims for punitive damages against Son and MNJ. The court's net judgment for Son in the amount of $321,849 reflected the total commissions earned by Son during the period 1979-1984, less amounts actually paid to Son and the funds he wrongfully converted. The district court reasoned that Son's Stipulation of Discontinuance and the Release of MNY in connection with the prior New York state court suit for unpaid commissions was fraudulently induced by Father; therefore, even if the Discontinuance and Release were judgments of the New York state court, they were not entitled to have a res judicata effect on Son's counterclaim and third-party complaint in this case; and, accordingly, Son was entitled to a judgment of damages for MNY's and Father's failure to pay the commissions earned between May 1, 1979 and March 1, 1984. The district court held also that MNY was not entitled to punitive damages for conversion.
 
 
 28
 On July 25, 1990, Son made two post-trial motions. First, he moved to vacate the September 16, 1988 partial summary judgment awarding compensatory damages to MNY. Second, Son moved to amend the July 16, 1990 trial judgment in his favor to add prejudgment interest on the amount of commissions past due.
 
 
 29
 On July 30, 1990, MNY and Father also made several post-trial motions. First, under Fed.R.Civ.P. 52(b), they sought to amend the district court's July 16, 1990 finding on MNY's gross profit margin: MNY and Father claimed that trial testimony showed MNY's gross profit margin was, on average, 23.6% rather than the 35% found by the district court. Thus, Father's and MNY's Rule 52(b) motion would reduce the amount of unpaid commissions earned by Son. Second, under Rule 59(e), MNY and Father sought to amend the July 16, 1990 judgment so as to reduce Son's award by the amount of 1984 commissions past due, on the grounds that Son did not maintain his claim for 1984 commissions in the pre-trial order. Third, and alternatively, MNY and Father moved under Rule 59(a) for a new trial on the issue of damages due Son on his counterclaim and third-party complaint.
 
 
 30
 On August 17, 1990, while the above-described post-trial motions were pending, MNY and Father gave notice of additional motions under Rule 60(b)(3), (4) and (6). MNY and Father sought to vacate the July 16, 1990 judgment; to award Father and MNY expenses including attorneys fees; and to stay enforcement of the district court's judgment pending appeal. In support of these motions, MNY and Father argued inter alia that the July 16, 1990 judgment against them was void by operation of the automatic stay triggered by Son's May 18, 1990 Chapter 13 bankruptcy petition; and because Son failed to advise MNY and Father of that petition.
 
 
 31
 Next, on August 28, 1990, MNY alone moved to amend the July 16, 1990 judgment for Son, so that the net amount awarded to Son would be reduced to reflect accrual of post-judgment interest on the September 16, 1988 partial summary judgment award of compensatory damages to MNY (which already included pre-judgment interest). A month later, on September 25, 1990, the Florida bankruptcy court dismissed Son's pending Chapter 13 case with prejudice.
 
 
 32
 On September 28, 1990, MNY and Father moved together again, this time under Rule 60(b)(3) and (6). They sought to vacate the July 16 judgment; to reinstate their demand for a jury trial which they had waived just before the bench trial; and to transfer the case to another district court judge. MNY and Father also sought an award of expenses and attorneys fees pursuant to 28 U.S.C. § 1927.[5] MNY and Father argued that their motions should be granted because of Son's misconduct communicating ex parte with the trial judge,[6] and because the trial judge was disqualified under 28 U.S.C. § 455(a)[7] for failing to recuse herself after not disclosing Son's ex parte communications with the court to MNY and Father before they waived their jury trial demand. Father and MNY contended that it was reasonable to think the trial judge's impartiality in the case might have been influenced by the court's knowledge of Son's bankruptcy.
 
 
 33
 In an opinion filed October 4, 1990, the district court decided the numerous motions made on July 25, July 30, August 17 and August 28, 1990, as follows. The court decided: to grant Son's July 25 motion to add prejudgment interest to the July 16, 1990 award of commissions past due, but to deny Son's concurrent motion to vacate the 1988 partial summary judgment awarding compensatory damages to MNY; to grant MNY's August 28 motion to amend the July 16, 1990 judgment so it would reflect accrual of post-judgment interest on the compensatory damages awarded MNY by the partial summary judgment; to grant MNY's and Father's July 30 Rule 59(e) motion to reduce the July 16, 1990 judgment by an amount equivalent to the commissions earned by Son during 1984, because Son never requested those commissions in the pretrial order; and, to deny the balance of MNY's and Father's motions.
 
 
 34
 On November 2, 1990, the district court denied MNY's and Father's Rule 60(b)(3) and (6) motions made on September 28, 1990. Then, by an order filed November 30, 1990, and as per the court's prior October 4, 1990 opinion, the district court finally disposed of the parties' motions of July 25 and 30, and August 17 and 28, 1991. Thus, the district court increased the net judgment in favor of Son to $450,217, so it would reflect the total of unpaid commissions claimed in the pre-trial order plus pre-judgment interest, less the amount (together with pre- and post-judgment interest) of MNY funds converted by Son.
 
 
 35
 Following this last district court order, Father and MNY filed a timely notice of appeal. They appeal "from the Order entering Final Judgment filed in this action on July 16, 1990, from the Order inter alia, amending the Final Judgment entered in this action on December 7, 1990 and from the Order entered on November 5, 1990."
 
 
 36
 The issues raised by appellants are these: (1) the effect of the automatic stay triggered by Son's bankruptcy on the district court's judgments; (2) whether the district court's finding of fraudulent inducement is clearly erroneous; (3) whether the district court's finding on damages is clearly erroneous; and (4) whether the district court abused its discretion when it failed to order a new trial on the issue of damages. Since our analysis of the automatic stay issue leads us to conclude that the last order entered by the district court in this case did not finally decide all claims of all the parties, we must dismiss without reaching the merits of other issues raised on appeal.
 
 II.
 
 37
 Scope and Effect of the Automatic Stay on District Court Proceedings
 
 
 38
 Appellants MNY and Father contend that the district court's July 16, 1990 trial judgment is void. They argue that bankruptcy's automatic stay, 11 U.S.C. § 362(a); was triggered by Son's May 18, 1990 bankruptcy petition and, therefore, the district court's July 16, 1990 judgment is void ab initio. This issue requires us to interpret and apply the legal precepts underlying section 362. Accordingly, the standard of review is plenary. Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98 (3d Cir.1981).
 
 
 39
 For the reasons below, we agree with appellants, but only in part. The automatic stay rendered the district court's judgment on MNY's claim for punitive damages against Son void ab initio, but it did not void the July 16, 1990 judgment with respect to MNY's claim for punitive damages against MNJ, or Son's claims against MNY and Father.
 
 A. Scope of the Automatic Stay
 
 40
 Section 362 of the Bankruptcy Act provides in part:
 
 
 41
 Automatic stay.
 
 
 42
 (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities, of--
 
 
 43
 (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title....
 
 
 44
 11 U.S.C. § 362(a)(1) (1991) (emphasis added).
 
 
 45
 Subsection (a) defines the scope of the automatic stay by listing acts that are stayed by the commencement of a bankruptcy case. All judicial actions against a debtor seeking recovery on a claim that were or could have been brought before commencement of a bankruptcy case, are automatically stayed. Subsection (b) of the statute enumerates specific exceptions to the automatic stay rule. See 11 U.S.C. § 362(b). None of the exceptions apply here.
 
 
 46
 The scope of the automatic stay is broad. Assoc. of St. Croix Condominium Owners v. St. Croix Hotel Corp., 682 F.2d 446, 448 (3d Cir.1982). "All proceedings are stayed, including ... judicial proceedings. Proceeding in this sense encompasses civil actions...." Id.
 
 
 47
 The automatic stay serves several purposes. First, it gives a bankrupt a breathing spell from creditors by stopping all collection efforts, all harassment, and all foreclosure actions. Id. The stay permits a bankrupt to attempt a repayment or reorganization plan or simply to be relieved of the financial pressures that drove him into bankruptcy. Second, the stay protects creditors by preventing particular creditors from acting unilaterally in self-interest to obtain payment from a debtor to the detriment of other creditors. Id. In other words, the stay "protect[s] the bankrupt's estate from being eaten away by creditors' lawsuits and seizures of property before the trustee has had a chance to marshal the estate's assets and distribute them equitably among the creditors." Martin-Trigona v. Champion Fed. Sav. & Loan Assoc., 892 F.2d 575, 577 (7th Cir.1989).
 
 
 48
 The stay of § 362 is "automatic" because it is triggered as against all entities upon the filing of a bankruptcy petition, irrespective of whether the parties to the proceedings stayed are aware that a petition has been filed. See NLT Computer Services v. Capital Computer Systems, 755 F.2d 1253, 1258 (6th Cir.1985); In re Koresko, 91 B.R. 689, 701 (Bankr.E.D.Pa.1988); In re Boston Business Machines, 87 B.R. 867, 870 (Bankr.E.D.Pa.1988). Because the automatic stay serves the interests of both debtors and creditors, it may not be waived and its scope may not be limited by a debtor. Commerzanstalt v. Telewide Systems, Inc., 790 F.2d 206, 207 (2d Cir.1986).
 
 
 49
 Only the bankruptcy court with jurisdiction over a debtor's case has the authority to grant relief from the stay of judicial proceedings against the debtor. Cathey v. Johns-Manville Sales Corp., 711 F.2d 60, 62-63 (6th Cir.1983), cert. denied, 478 U.S. 1021, 92 L.Ed.2d 740 (1986). The bankruptcy court may provide relief upon request of "a party in interest" and after notice and a hearing. See 11 U.S.C. § 362(d). The court grants relief "by terminating, annulling, modifying, or conditioning the stay." Id.[8] If relief from the stay is granted, judicial proceedings against the debtor may then continue. In re Highway Truck Drivers & Helpers Local 107, 888 F.2d 293, 298 (3d Cir.1989).
 
 
 50
 Although the scope of the automatic stay is broad, the clear language of section 362(a) indicates that it stays only proceedings against a "debtor"--the term used by the statute itself. St. Croix, 682 F.2d at 448. "The statute does not address actions brought by the debtor which would inure to the benefit of the bankruptcy estate." Id. See also In re Berry Estates, 812 F.2d 67, 71 (2d Cir.), cert. denied, 484 U.S. 819, 108 S.Ct. 77, 98 L.Ed.2d 40 (1987); Martin-Trigona, 892 F.2d at 577.
 
 
 51
 Whether a specific judicial proceeding falls within the scope of the automatic stay must be determined by looking at the proceeding "at its inception." St. Croix, 682 F.2d at 449. "That determination should not change depending on the particular stage of the litigation at which the filing of the petition in bankruptcy occurs." Id. Thus, the dispositive question is whether a proceeding was "originally brought against the debtor." Id. See also Teachers Ins. & Annuity Ass'n of America v. Butler, 803 F.2d 61, 64-65 (2d Cir.1986).
 
 
 52
 All proceedings in a single case are not lumped together for purposes of automatic stay analysis. Even if the first claim filed in a case was originally brought against the debtor, section 362 does not necessarily stay all other claims in the case. Within a single case, some actions may be stayed, others not. Multiple claim and multiple party litigation must be disaggregated so that particular claims, counterclaims, crossclaims and third-party claims are treated independently when determining which of their respective proceedings are subject to the bankruptcy stay.
 
 
 53
 Thus, within one case, actions against a debtor will be suspended even though closely related claims asserted by the debtor may continue. Judicial proceedings resting on counterclaims and third-party claims asserted by a defendant-debtor are not stayed, while same-case proceedings arising out claims asserted by the plaintiff are stayed. See First Wisconsin National Bank v. Grandlich Development Corp., 565 F.2d 879, 880 (5th Cir.1978) (automatic stay did not bar district court's dismissal of debtor's counterclaim in action originally brought against debtors, "because the counterclaim was not a proceeding against the debtors"); Jefferson Ward Stores, Inc. v. Doody Co., 48 B.R. 276, 278-79 (E.D.Pa.1985) (automatic stay does not bar district court's denial of debtor's Rule 54(b) motion made in connection with third-party claim brought by debtor); Boone v. Beacon Bldg. Corp., 613 F.Supp. 1151, 1155 (D.N.J.1985) (stay only operates as against actions in which bankruptcy petitioner is in defensive posture; thus bankrupt's crossclaim against codefendant for contribution is not stayed); Trans Caribbean Lines v. Tracor Marine, Inc., 49 B.R. 360, 362 (S.D.Fla.1985) (since prosecution of counterclaims and crossclaims by debtor is not stayed by § 362, court's dismissal of debtor's counterclaims or cross claims is not barred by § 362); In re Regal Construction Co., 28 B.R. 413, 416 (Bankr.D.Md.1983) (automatic stay did not preclude debtor from proceeding on counterclaim which it had brought).
 
 
 54
 Furthermore, the automatic stay is not available to non-bankrupt co-defendants of a debtor even if they are in a similar legal or factual nexus with the debtor.[9] Lynch v. Johns-Manville Sales Corp., 710 F.2d 1194, 1196-97 (6th Cir.1983) ("[i]t is universally acknowledged that an automatic stay of proceedings accorded by § 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the ... debtor"). See also Austin v. Unarco Industries, Inc., 705 F.2d 1, 4-5 (1st Cir.), cert. dismissed, 463 U.S. 1247, 104 S.Ct. 34, 77 L.Ed.2d 1454 (1983); Teachers Ins. & Annuity Ass'n. v. Butler, 803 F.2d at 65; Williford v. Armstrong World Indus., Inc., 715 F.2d 124, 126-27 (4th Cir.1983); Wedgeworth v. Fibreboard Corp., 706 F.2d 541, 544 (5th Cir.1983); Clay v. Johns-Manville Sales Corp., 722 F.2d 1289, 1290-91 (6th Cir.1983), cert. denied, 467 U.S. 1253, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984); Pitts v. Unarco Industries, Inc., 698 F.2d 313, 314 (7th Cir.1983); Fortier v. Dona Anna Plaza Partners, 747 F.2d 1324, 1330 (10th Cir.1984); In re Lessig Const., Inc., 67 B.R. 436 (Bankr.E.D.Pa.1986) (in adversarial action brought by debtor in bankruptcy court, defendant must obtain relief from automatic stay before asserting any counterclaim against debtor); Action Drug Co., Inc. v. Overnite Transp. Co., 724 F.Supp. 269 (D.Del.1989) (where plaintiff-debtor enters bankruptcy, defendant may not assert counterclaim against bankrupt plaintiff), aff'd without op., 902 F.2d 1558 (3d Cir.1990). But see A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999 (4th Cir.) (automatic stay may be extended to non-bankrupt codefendants in unusual circumstances), cert. denied, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986).
 
 
 55
 In this regard, formal distinctions between debtor-affiliated entities are maintained when applying the stay. A proceeding against a non-bankrupt corporation is not automatically stayed by the bankruptcy of its principal, Marcus, Stowell & Beye v. Jefferson Investment, Corp., 797 F.2d 227, 230 n. 4 (5th Cir.1986); Personal Designs, Inc. v. Guymar, Inc., 80 B.R. 29, 30 (E.D.Pa.1987); and, section 362 does not bar an action against the principal of a debtor-corporation. In re Philadelphia Gold Corp., 56 B.R. 87, 90 (Bankr.E.D.Pa.1985).
 
 
 56
 Applying these principles here, we hold that section 362 stayed only MNY's conversion claim against Son, but not MNY's conversion claim against MNJ or Son's claims against MNY and Father. Only MNY's conversion claim against Son is an action against a "debtor", and so only proceedings arising out of that claim were stayed automatically by the filing of Son's May 18, 1990 bankruptcy petition.
 
 B. Effect of Automatic Stay
 
 57
 Once triggered by a debtor's bankruptcy petition, the automatic stay suspends any non-bankruptcy court's authority to continue judicial proceedings then pending against the debtor. This is so because § 362's stay is mandatory and "applicable to all entities", including state and federal courts. 11 U.S.C. § 362(a). See Boynton v. Ball, 121 U.S. 457, 466-67, 7 S.Ct. 981, 984, 30 L.Ed. 985 (1887) ("where the bankruptcy proceedings are brought to the attention of the court in which a suit is being prosecuted against a bankrupt, that court shall not proceed to final judgment until the question of his discharge shall have been determined"); In re Highway Truck Drivers & Helpers Local 107, 888 F.2d at 299 n. 8 (if state court proceeds in violation of stay, "such proceedings would have been in excess of the state court's authority and subject to collateral attack"); Ellis v. Consolidated Electric Corp., 894 F.2d 371, 373 (10th Cir.1990) (district court "lacked power" to enter order in violation of automatic stay); Cathey v. Johns-Manville Sales Corp., 711 F.2d 60, 61 (6th Cir.1983) ("the automatic stay of proceeding is applicable at both the trial and appellate levels"), cert. denied, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986); Kommanditselskab Supertrans v. O.C.C. Shipping, Inc., 79 B.R. 534, 540 (S.D.N.Y.1987) (if stay applies, "the district court's power to adjudicate the case is suspended pending the outcome of the bankruptcy proceedings").
 
 
 58
 The automatic stay's effect on judicial proceedings against the debtor does not depend upon whether the court finds for or against the debtor. Ellis, 894 F.2d at 373. Once triggered, the automatic stay of an action pending against the debtor in district court "continues until the bankruptcy case is closed, dismissed, or discharge is granted or denied, or until the bankruptcy court grants some relief from the stay. 11 U.S.C. § 362(a), (c)(2), (d), (e), (f)." Pope v. Manville Forest Products Corp., 778 F.2d 238, 239 (5th Cir.1985). See also In re De Jesus Saez, 721 F.2d 848, 851-2 (1st Cir.1983) (stay terminates when Chapter 13 petition is dismissed).
 
 
 59
 Absent relief from the stay, judicial actions and proceedings against the debtor are void ab initio. Kalb v. Feuerstein, 308 U.S. 433, 438-40, 60 S.Ct. 343, 346, 84 L.Ed. 370 ("the action of the ... Court was not merely erroneous but was beyond its power, void, and subject to collateral attack"). See also In re Ward, 837 F.2d 124, 126 (3d Cir.1988) (sheriff's sale conducted in violation of the stay is "void and without effect", citing Kalb ).[10] But see Picco v. Global Marine Drilling Co., 900 F.2d 846, 850 (5th Cir.1990) (district court dismissal of action in violation of stay voidable, not void), citing Sikes v. Global Marine, Inc., 881 F.2d 176, 178 (5th Cir.1989) (filing of complaint against the debtor in unknowing violation of the stay is voidable rather than void); In re Schwartz, 119 B.R. 207, 208-11 (9th Cir.Bankr.1990) (tax assessment in violation of stay voidable, not void).[11] Cf. In re Norma James, 940 F.2d 46 (3d Cir.1991, as amended August 7, 1991) (if state court judgment is not void ab initio because it falls within exception to automatic stay, lower federal court may not vacate judgment).
 
 
 60
 Holding that judicial acts and proceedings in violation of the automatic stay are void ab initio is consistent with the stay's function of "enabl[ing] the bankruptcy court to decide whether it will exercise its power under section 502(b) of the Bankruptcy Code to establish the validity and amount of claims against the debtor or allow another court to do so, thereby preventing a 'chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.' " Hunt v. Bankers Trust Co., 799 F.2d 1060, 1069 (5th Cir.1986), quoting In re Holtkamp, 669 F.2d 505 (7th Cir.1982). Consolidating all pre-petition claims against the debtor in one collective proceeding before a bankruptcy court is the essence of bankruptcy.[12] See Thomas H. Jackson, The Logic and Limits of Bankruptcy Law 7-19 passim (1986).
 
 
 61
 Also, by treating judicial acts and proceedings in violation of the stay as void acts, we deter non-bankruptcy courts from continuing proceedings against a debtor who has sought federal bankruptcy protection. The result is to conserve debtor assets which should be marshalled to satisfy creditor claims instead of expended as legal costs in defending against suits in violation of the stay.
 
 
 62
 Since the bankruptcy court with jurisdiction over Son's Chapter 13 case never granted relief from the automatic stay triggered on May 18, 1988, we hold that the district court had no authority to continue the proceedings in MNY's conversion action against Son after he filed his bankruptcy petition, and therefore, the district court's actions in violation of the stay are void ab initio. The district court must vacate its orders to the extent they have adjudicated MNY's conversion claim against Son during the pendency of Son's bankruptcy.
 
 
 63
 During Son's bankruptcy proceeding, May 18-September 25, 1990, the district court could not try MNY's claim for punitive damages and could not render any judgment on that claim. It follows that the district court could not properly decide any post-trial motions pertaining to the conversion claim. Indeed, during Son's bankruptcy proceeding, the parties themselves could not validly undertake any judicial action material to the conversion claim against Son.
 
 
 64
 Thus, the district court's July 16, 1990 judgment rejecting MNY's claim for punitive damages against Son must be vacated. So too, the district court's post-trial orders must be vacated and amended to the extent they dispose of motions arising out of MNY's conversion claim against Son.[13]
 
 
 65
 For the same reasons, MNY's July 2, 1990 waiver of its right to jury trial is a nullity, but only to the extent the waiver goes to trial of MNY's conversion claim against Son. Lacking power to act in any proceeding against Son qua debtor, the district court could not give its imprimatur of approval to such a waiver. Theoretically at least, MNY is now free to seek a jury trial of its claim for punitive damages against Son.
 
 
 66
 We hasten to add, however, that despite the bankruptcy stay's effect on MNY's conversion claim against Son, the bankruptcy stay did not affect the district court proceedings and judgments arising out of other claims in this case.[14] See Ellis, 894 F.2d at 373 n. 4. Therefore, the prospect of a jury trial de novo on MNY's punitive damages claim against Son is, perhaps, remote. Since the district court did have power to make findings of fact and render judgment on MNY's conversion claim against MNJ, the district court might properly determine with issue preclusion analysis on remand that MNY is bound by facts found in the trial of MNY's conversion claim against MNJ. It might conclude that no jury trial of any fact is required to enter a final judgment on MNY's conversion claim against Son. But, we leave this analysis for the district court in the first instance.
 
 III.
 Effect of Stay on Appellate Jurisdiction
 
 67
 Since we hold that the district court's judgment rejecting MNY's claim for punitive damages against Son was void ab initio, the district court has not yet entered a valid order finally adjudicating MNY's conversion action against Son. It follows that we are without jurisdiction to consider the merits of other issues raised by the parties on appeal. "Although not briefed by either party, we cannot ignore matters that bring into question the existence of federal jurisdiction." Thermice Corp., 832 F.2d at 251.
 
 
 68
 A judgment is final and appealable under 28 U.S.C. § 1291 if it " 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 275, 108 S.Ct. 1133, 1136, 99 L.Ed.2d 296 (1988) (quoting Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). See also Sussex Drug Products v. Kanasco, Ltd., 920 F.2d 1150, 1153 (3d Cir.1990). Nevertheless, Fed.R.Civ.P. 54(b) provides for special express certifications of finality which permit "entry of a final judgment as to one or more but fewer than all of the claims or parties". But "[a]bsent special certification, a judgment is final only if it disposes of all of the claims of all of the parties." Matter of Vitreous Steel Products Co., 911 F.2d 1223, 1230 n. 3 (7th Cir.1990).[15]
 
 
 69
 Since the district court has yet to enter an order finally deciding the merits of all components of MNY's conversion claim against Son, and because there is no proper Rule 54(b) certification in this case,[16] the district court has not rendered a final, appealable order. Accordingly, we will dismiss for lack of appellate jurisdiction. See similarly Ellis, 894 F.2d at 373.
 
 IV.
 Conclusion
 
 70
 We will dismiss this appeal for lack of appellate jurisdiction, and remand to the district court for further proceedings in accordance with this opinion.
 
 OPINION SUR PANEL REHEARING
 
 71
 March 24, 1992.
 
 
 72
 NYGAARD, Circuit Judge.
 
 
 73
 We vacated our earlier reported opinion and granted panel rehearing primarily to reconsider the district court's subject matter jurisdiction, an issue raised obliquely by appellants' Petition for Rehearing.[1]
 
 
 74
 In our earlier opinion we said the district court had original diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). Indeed, that the district court had diversity jurisdiction at the outset and conclusion of the proceedings below is not in question.
 
 
 75
 Nevertheless, appellants' petition for rehearing asserts that the New Jersey district court improperly adjudicated Michael Gill's claims against appellants after Michael filed his chapter 13 petition in the Southern District of Florida. Appellants maintain that upon the filing of Michael's bankruptcy petition, 28 U.S.C. § 1334(b) required that Michael's claims against appellants, then pending in the New Jersey district court, should have been heard in the first instance only by the Florida bankruptcy court. Since § 1334(b) is a jurisdictional statute, we construe appellants' argument to be a challenge to the district court's subject matter jurisdiction.
 
 
 76
 The question, then, is whether appellee Michael Gill's bankruptcy in Florida somehow divested the New Jersey district court of subject matter jurisdiction over Michael's claims against appellants which were pending in New Jersey when Michael's bankruptcy petition was filed.[2] Since, for the reasons discussed below, we are satisfied that the New Jersey district court always had subject matter jurisdiction over all of the claims in this case, we will issue an order which reinstates our vacated opinion and once again dismisses this appeal for lack of a final judgment.
 
 I.
 
 77
 The rather complicated procedural facts of this case are fully described in our earlier opinion, and will not be repeated in detail here. It is enough to recall the following. In June 1987, Maritime Electric Co., Inc., a New York corporation ("MNY"), brought suit in New Jersey district court against Michael Gill and a New Jersey corporation he controlled. MNY sought actual and punitive damages for conversion. Michael in turn asserted a counterclaim against MNY, and a related third party complaint against his father, Thomas Gill.
 
 
 78
 This entire complex of litigation was still pending in the New Jersey district court when, on May 18, 1990, Michael filed for chapter 13 bankruptcy protection in the Southern District of Florida. Bankruptcy relief was ordered, but Michael's bankruptcy case was short-lived; that is, the case was dismissed with prejudice after several months, before the pending New Jersey district court litigation was concluded.
 
 
 79
 In effect, Michael Gill's Florida bankruptcy was a temporary event which interrupted but did not survive the New Jersey litigation. Nevertheless, the effect of the bankruptcy on the New Jersey proceedings was profound. Although the New Jersey district court was made aware of Michael's chapter 13 filing, the court failed to recognize that the bankruptcy automatically stayed certain facets of the continuing New Jersey proceedings: the New Jersey district court erred by continuing to adjudicate the case before it in all respects.
 
 
 80
 Since the automatic stay provisions of 11 U.S.C. § 362 were triggered for the duration of the Florida bankruptcy, we held that the stay rendered void ab initio the post-petition New Jersey district court proceedings based on MNY's suit against Michael Gill. While Michael's pending claims against MNY and his father were not covered by the automatic stay, MNY's suit against Michael could not proceed after the chapter 13 case commenced unless the Florida bankruptcy court lifted the stay. There was no such lifting of the stay.
 
 
 81
 Therefore, we concluded in our earlier opinion that a purportedly final New Jersey district court order which preceded the appeal in this case did not finally adjudicate all the claims in the case. Because the automatic stay had voided certain proceedings based on MNY's complaint against Michael Gill, litigation of MNY's claim was left incomplete. Furthermore, the district court had made no proper Fed.R.Civ.P. 54(b) certification. Without that, we dismissed for lack of a final, appealable judgment.
 
 II.
 
 82
 The petition for rehearing raised the possibility that 28 U.S.C. § 1334(b) divested the New Jersey district court of subject matter jurisdiction over Michael's claims against appellants. We now consider and reject that possibility.
 
 
 83
 Section 1334 grants original jurisdiction over bankruptcy cases and proceedings to the district courts. 28 U.S.C. § 1334(a)-(b). Only federal district courts have original, but not necessarily exclusive, jurisdiction over bankruptcy cases and proceedings. Nevertheless, district courts may properly refer bankruptcy cases and proceedings to federal bankruptcy judges. See 28 U.S.C. § 157; see also generally 1 Collier on Bankruptcy p 3.01 (15th ed. 1991).[3]
 
 
 84
 Section 1334(a) provides, "[e]xcept as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. § 1334(a). Section 1334(b) provides in part, "the district courts shall have original but not exclusive jurisdiction of all civil proceedings ... related to cases under title 11." 28 U.S.C. § 1334(b) (emphasis added). Civil proceedings "related to" a particular bankruptcy case must, of course, be distinguished from "cases under title 11", and civil proceedings "arising under" or "arising in" bankruptcy cases. See 1 Collier p 3.01[c][ii].
 
 
 85
 A district court's § 1334(b) "related to" jurisdiction is extensive.
 
 
 86
 A proceeding is "related to" a bankruptcy case if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy. Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.
 
 
 87
 Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir.1984) (citations and emphasis omitted) (interpreting predecessor to § 1334(b)); Borman v. Raymark Industries, Inc., 946 F.2d 1031, 1036 (3d Cir.1991). "Related to" jurisdiction includes proceedings resting on causes of action owned by a debtor on facts in existence when the debtor files for bankruptcy protection. See 1 Collier p 3.01[c][iv].
 
 
 88
 The New Jersey district court proceedings resting on Michael Gill's counterclaim and third party complaint against MNY and his father, respectively, were just such proceedings "related to" Michael's bankruptcy within the meaning of § 1334(b). The adjudication of Michael's claims against appellants would certainly impact upon the administration of his estate and, indeed, these claims became property of Michael's estate upon the filing of his bankruptcy petition because a chapter 13 debtor's estate includes all of the debtor's legal and equitable interests as of the date of the filing of his petition. See 11 U.S.C. §§ 1306, 541.[4]
 
 
 89
 It follows that, in addition to having diversity jurisdiction over all the claims in this case before, during and after Michael Gill filed his bankruptcy petition in Florida, the New Jersey district court had also, for the limited period covered by Michael's bankruptcy, "related to" bankruptcy jurisdiction over Michael's claims against appellants. In other words, 28 U.S.C. § 1334(b) does not compel the conclusion advanced in the petition for rehearing, namely, after Michael filed for bankruptcy protection, a jurisdictional statute dictated that only the Florida bankruptcy court could in the first instance hear Michael's pending claims against appellants; rather, with the commencement of Michael's bankruptcy case, § 1334(b) became an additional basis for the district court's subject matter jurisdiction over Michael's claims against appellants.
 
 
 90
 First, § 1334(b) does not confer "related to" jurisdiction only upon the specific district court presently exercising jurisdiction over a particular bankruptcy case "under title 11".[5] Instead, the district courts generally enjoy § 1334(b)'s grant of "related to" bankruptcy jurisdiction. All district courts are empowered by the statute to hear cases "realted to" specific bankruptcies pending in other district courts.[6]
 
 
 91
 Second, while it may be argued forcefully that the federal bankruptcy laws tend "to focus all bankruptcy related matters in a single bankruptcy court," we have said it is clear that "Congress did not envision all bankruptcy related matters being adjudicated in a single bankruptcy court." Hays and Co. v. Merrill Lynch, 885 F.2d 1149, 1157 (3d Cir.1989). While the proper venue for civil proceedings related to a case under chapter 13 is ordinarily the district in which the chapter 13 case is itself pending, see 28 U.S.C. § 1409, that venue rule applies only to proceedings commenced after a Chapter 13 petition is filed.[7]
 
 
 92
 Where a civil proceeding already pending in one district court becomes "related to" a chapter 13 case subsequently filed in another district court, the proper method for transferring the related proceeding to the bankruptcy court hearing the chapter 13 case is to seek a change of venue in the nonbankruptcy forum pursuant to 28 U.S.C. § 1412 and Bankruptcy Rule 7087.[8] After the related proceeding is transferred to the district court wherein the chapter 13 case is pending, then pursuant to 28 U.S.C. § 157(a), the related proceeding may be referred to the bankruptcy court actually hearing the chapter 13 case.
 
 
 93
 Having considered the jurisdictional argument raised by the petition for rehearing we hold that, during the period of Michael's short-lived bankruptcy in Florida, the New Jersey district court exercised both original diversity jurisdiction and "related to" bankruptcy jurisdiction under 28 U.S.C. § 1334(b) over Michael's claims against appellants.
 
 III.
 
 94
 For sake of completeness, we hold similarly that, during the period covered by Michael's bankruptcy, the New Jersey district court had both original diversity and "related to" bankruptcy jurisdiction over MNY's claims against Michael. Even though proceedings on MNY's claims against Michael were automatically stayed upon the filing of Michael's bankruptcy petition, that stay did not automatically divest the district court of diversity jurisdiction over the stayed proceedings. Furthermore, MNY's claims against Michael became "related to" Michael's bankruptcy upon the filing of his petition, because adjudication of those claims would directly affect the administration of Michael's estate.
 
 VI.
 
 95
 Additionally, there is no merit to a collateral estoppel argument raised in the petition for rehearing. The argument is that, after the filing of Michael's chapter 13 petition, the New Jersey district court should no longer have heard Michael Gill's counterclaim against MNY because factual predicates of Michael's claim and MNY's affirmative defense thereto might potentially have issue preclusive effect in a subsequent bankruptcy proceeding wherein MNY as creditor would assert a claim against Michael as debtor.
 
 
 96
 The argument falls short because there is nothing inherently objectionable to bankruptcy courts giving issue preclusive effect to valid prior judgments, even if doing so would inevitably establish a creditor's claim in a core proceeding. The doctrine of collateral estoppel (issue preclusion) may be used in a subsequent bankruptcy proceeding to prevent relitigation of issues that were actually and necessarily resolved in a prior nonbankruptcy adjudication. See Grogan v. Garner, --- U.S. ----, 111 S.Ct. 654, 658, 112 L.Ed.2d 755 (1991).
 
 
 97
 Also, the collateral estoppel argument would prevent debtors and bankruptcy trustees from prosecuting a debtor's prepetition causes of action in nonbankruptcy fora whenever such actions would settle factual matters that might later also be at issue in a contested claim against the debtor's estate. This would be incongruous with a chapter 13 debtor's right to remain in possession of and use all property of his or her estate, including prepetition causes of action. See note 2 above, at page 1209. More generally, the argument would also controvert the right of trustees and debtors in possession to commence and prosecute any action on behalf of the estate in any tribunal with or without bankruptcy court approval. See Bankruptcy Rule 6009.[9]
 
 V.
 
 98
 In conclusion, the New Jersey district court always had subject matter jurisdiction over all proceedings in this case until a notice of appeal was filed. The district court's original diversity jurisdiction was not compromised by Michael Gill's short-lived chapter 13 bankruptcy and, indeed, the bankruptcy worked temporarily to confer additional § 1334(b) "related to" subject matter jurisdiction on the district court with respect to the claims asserted against Michael, and his claims against appellants. Nothing in the petition for rehearing supports the proposition that following commencement of Michael Gill's bankruptcy, only the Florida bankruptcy court could hear Michael's claims against appellants in the first instance.
 
 
 99
 Since we are satisfied that the district court always had subject matter jurisdiction, we will reinstate our vacated opinion and dismiss this appeal once again for lack of a final judgment.
 
 ORDER
 
 100
 We reinstate the opinion originally filed December 2, 1991 and vacated by an order dated January 10, 1992.
 
 
 
 *
 Honorable John P. Fullam, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 More particularly, the record shows that the district court filed both its partial summary judgment opinion and a preliminary partial summary judgment order on August 8, 1988; and then later, on September 16, 1988, filed a final partial summary judgment order. The last order (as contrasted with the preliminary order) purportedly certified the court's partial summary judgment as a final, appealable order, because Son and MNJ were unable to post bond covering the judgment for MNY. As discussed below, see note 16, the district court's purported certification of finality was flawed
 
 
 [2]
 This overlap of issues may determine whether any further trial is needed on remand. See discussion below, at 1203
 
 
 [3]
 We take judicial notice of the docket entries in the bankruptcy court's file on Son's case. From these entries we know the actual dates of Son's bankruptcy proceedings. These dates are important to our analysis of the scope and effect of the automatic stay which was triggered by Son's Chapter 13 petition
 
 
 [4]
 Contrary to MNY's and Father's assertion on appeal, Son did not abandon his contractual claims during trial. Although Son's attorney told the district court that Son was not seeking to enforce the terms of the oral settlement agreement fraudulently induced by Father, nothing in the record leads us to conclude that Son waived his contractual claim alleging that MNY and Father breached Son's employment agreement with MNY. Thus, the district court could have properly tried Son's claim for unpaid commissions as a contractual claim because it alleged MNY and Father (in his capacity as MNY's President) breached the commission agreement covering Son's work for MNY between May 1, 1979 and March 1, 1984
 Nonetheless, the record on appeal does not indicate clearly what legal theory underpins the district court's award of damages to Son. Indeed, the district court's pronouncements on this point are ambiguous. In its Findings of Fact and Conclusions of Law filed July 16, 1990, the court said, "[w]hat was before the court for trial were Maritime N.Y.'s claim for punitive damages on the conversion claim ... and Michael Gill's counterclaim for earned commissions against Maritime N.Y. and Thomas Gill". [App. 125] Thus, the district court implies especially at note 2 of its opinion that Son's recovery was based on a contractual theory. Later, however, when adding prejudgment interest to the award of commissions past due, the district court says differently that Son's recovery was based on his "fraud claim, the sole claim tried, a claim which accrued in April 1985." [App. 257] (emphasis added).
 We think that, on remand, the district court should clarify its findings of fact and conclusions of law. Clarification will facilitate appellate review if and when the parties reassert appeals later.
 
 
 [5]
 Section 1927 (1991) provides:
 Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.
 
 
 [6]
 Son submitted three letters to the district court without copying counsel for Father and MNY. The first letter of one page requested "that a motion be filed" to terminate Son's relationship with his attorney. The district court responded, advising Son that no motion or hearing was necessary to accomplish that, but instead Son should supply the name and address of any new attorney to the court
 The second letter sent to the district court, handwritten and seventeen pages long, recounted many extra-judicial events about the case. This letter was not read by the trial judge, although she did subsequently advise Son not to make any submissions to the court without copying all parties to the case. Nevertheless, probably before Son received the court's advice, he mailed another one-page letter to the district court indicating that he had filed a voluntary petition for bankruptcy on May 18, 1990. Father and MNY complained about these last two letters in their Rule 60(b)(3) and (6) motions. See generally App. 261-267.
 
 
 [7]
 Section 455(a) (1991) provides:
 Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might be reasonably be questioned.
 
 
 [8]
 Section 362(d), 11 U.S.C., provides more fully, in part:
 "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--
 "(1) for cause...."
 
 
 [9]
 Chapter 13 of the Bankruptcy Code does contain provision for a stay of proceedings against non-debtors who are jointly liable with a debtor on a consumer debt, or secured a debtor's consumer debt. However, that provision does not apply in this case. See 11 U.S.C. § 1301 (1991)
 
 
 [10]
 Other cases among the many holding that judicial acts in violation of the automatic stay are void, are these: In re Advent Corp., 24 B.R. 612 (1st Cir.Bankr.1982); In re 48th Street Steakhouse, Inc., 835 F.2d 427, 431 (2d Cir.), cert. denied, 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1987); In re Smith, 876 F.2d 524, 526 (6th Cir.1989); In re Shamblin, 890 F.2d 123, 125 (9th Cir.1989); Ellis, 894 F.2d at 372; In re Albany Partners, Ltd., 749 F.2d 670, 675 (11th Cir.1984); In re Joyce Purnell, 92 B.R. 625 (Bankr.E.D.Pa.1988); In re Clark, 69 B.R. 885, 891, vacated in part on other grounds, 71 B.R. 747 (Bankr.E.D.Pa.1987); In re A.I.A. Industries, Inc., 75 B.R. 1013, 1021 n. 5 (Bankr.E.D.Pa.1987); In re Fasgo, Inc., 58 B.R. 99, 100 (Bankr.E.D.Pa.1986); In re Marta Group, Inc., 33 B.R. 634, 639 (Bankr.E.D.Pa.1983)
 
 
 [11]
 The courts concluding that acts violating the stay are voidable rather than void rely on section 362(d) of the Bankruptcy Code which permits retroactive annulment of the stay, see Picco, 900 F.2d at 850, and on other provisions of the Code which have been used to cure acts purportedly void under the automatic stay. See generally In re Schwartz, 119 B.R. at 209. These courts maintain that a violation of the stay "can be declared invalid in an appropriate proceeding but are capable of being cured by confirmation or ratification or if no proceeding is brought to avoid the voidable act." Id. at 209
 We need not decide here whether a bankruptcy court may exercise its equitable powers to retroactively rehabilitate judicial acts and proceedings which would otherwise be void ab initio as violations of the automatic stay. Here, the bankruptcy court never granted prospective or retroactive relief from the automatic stay.
 
 
 [12]
 A suit for damages pending against a debtor in a non-bankruptcy court when the debtor files his petition, becomes a "claim" for bankruptcy purposes and may be liquidated by the bankruptcy court in a core proceeding without any final determination of the action by the non-bankruptcy court. See In re Meyertech Corp., 831 F.2d 410, 417-18 (3d Cir.1987)
 
 
 [13]
 All of MNY's post-judgment motions made during the pendency of Son's bankruptcy with respect to its conversion claim against Son are void. For example, MNY's August 28, 1990 motion to amend the July 16, 1990 judgment to reflect accrual of post-judgment interest on the September 16, 1988 partial summary judgment award of actual conversion damages to MNY is void. So too is the district court's November 30, 1990 order granting that particular motion, and therefore that order must be vacated
 Similarly, Son's own July 25, 1990 motion made during the pendency of his bankruptcy is void to the extent it sought to vacate the 1988 summary judgment on MNY's conversion claim against Son. The district court's November 30 denial of that aspect of Son's July 25 motion must be vacated.
 To the extent MNY's and Father's Rule 60 motions of August 17 and September 28, 1990 were void ab initio and must be reconsidered, the district court should take action consistent with this opinion on remand.
 
 
 [14]
 Despite Son's bankruptcy, the district court was authorized to decide the following motions: Son's July 25, 1990 motion to amend the July 16 judgment to add prejudgment interest to the award on Son's claims against MNY and Father; and also, MNY's and Father's July 30, 1990 Rule 52(b) and Rule 59(a) & (e) motions, which all focused only on the quantum of damages awarded on Son's counterclaim and third-party claim
 
 
 [15]
 Fed.R.Civ.P. 54(b) states, in part,
 In the absence of [a valid Rule 54(b) certification], any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.
 
 
 [16]
 The district court attempted Rule 54(b) certification of its partial summary judgment on MNY's claim for compensatory damages against Son and MNJ. See Order of Partial Summary Judgment. [App. 62-64] However, the purported certification is defective for two reasons
 First, the district court's order omitted to make "an express determination that there is not just reason for delay" and "an express direction for the entry of judgment". See Rule 54(b). Second, even if the district court had made the express statements required by the Rule, certification of the partial summary judgment on MNY's conversion claim would remain improper because that judgment only decided the issue of compensatory damages.
 As we have said elsewhere, "[t]he partial adjudication of a single claim is not appealable, despite a rule 54(b) certification." Sussex Drug Products, 920 F.2d at 1154. Applicable here is our holding there: "[w]hen liability rests on the same transaction or series of transactions, a count for punitive damages, although of a different order than compensatory damages, does not constitute a separate claim under Rule 54(b)." Id. at 1155.
 
 
 [1]
 Other arguments advanced in the Petition for Rehearing only challenge the merits of our earlier opinion's holding on the effect of bankruptcy's automatic stay, 11 U.S.C. § 362(a)(1), in the circumstances of this case. We do not revisit the automatic stay issue, because we will reinstate our earlier opinion which covers that point
 
 
 [2]
 Michael Gill's capacity to continue prosecuting his claims against appellants after filing his bankruptcy petition is not challenged, nor should it be. Chapter 13 debtors are empowered to maintain suit even after a bankruptcy trustee has been appointed in their case: an essential feature of a chapter 13 case is that the debtor retains possession of and may use all the property of his estate, including his prepetition causes of action, pending confirmation of his plan
 Section 1303 of the Bankruptcy Code specifies rights and powers over estate property that the chapter 13 debtor has exclusive of a chapter 13 trustee, whose rights and duties are defined by § 1302 of the Code. See 11 U.S.C. §§ 1303, 1302; see also Bankruptcy Rule 2015(c).
 The legislative history underlying § 1303 makes clear that although the enumerated powers granted by that section do not expressly include a chapter 13 debtor's right to sue and be sued, Congress intended such debtor would have power to maintain suit on his own behalf. See 124 Cong.Rec. H32,409 (Sept. 28, 1978); S34,009 (Oct. 5, 1978).
 
 
 [3]
 Section 157 provides in pertinent part:
 (a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.
 (b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section....
 (c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11.
 28 U.S.C. § 157.
 
 
 [4]
 Section 1306 provides in pertinent part:
 (a) Property of the estate includes ... the property specified in section 541 of this title ...
 (b) Except as provided in a confirmed plan or order confirming a plan, the debtor shall remain in possession of all property of the estate.
 11 U.S.C. § 1306.
 Section 541 defines the property in a bankruptcy estate as including (with limited exceptions) "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). These legal and equitable interests include causes of action belonging to the debtor at the time the debtor's bankruptcy commenced. See 4 Collier p 541.10.
 
 
 [5]
 A case "under title 11" within the meaning of § 1334(a) is a bankruptcy case, "upon which all of the proceedings which follow the filing of a petition are predicated." 1 Collier p 3.01[c][i]
 
 
 [6]
 This is all the more clear given 28 U.S.C. § 1452, which permits removal of any pending civil claim or cause of action (with certain limited exceptions) "to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of [title 28]". 28 U.S.C. § 1452(a) (emphasis added). Since the district in which a civil proceeding "related to" a particular bankruptcy is pending will not necessarily be the same district wherein the bankruptcy case itself is pending, the plain meaning of § 1452 indicates the district courts generally may exercise § 1334(b) jurisdiction
 
 
 [7]
 Each provision of 28 U.S.C. § 1409, which defines the proper venue of proceedings arising under title 11 or arising in or related to cases under title 11, indicates only where such proceedings "may commence" or "may be commenced"
 
 
 [8]
 Section 1412 provides, "[a] district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412
 Bankruptcy Rule 7087 provides in pertinent part, "[o]n motion and after a hearing, the court may transfer an adversary proceeding or any part thereof to another district pursuant to 28 U.S.C. § 1412...."
 
 
 [9]
 Rule 6009 provides: "With or without court approval, the trustee or debtor in possession may prosecute or may enter an appearance and defend any pending action or proceeding by or against the debtor, or commence and prosecute any action or proceeding in behalf of the estate before any tribunal."