EXCELSIOR INSURANCE COMPANY, Plaintiff,

v.

PENNSBURY PAIN CENTER, Defendant/Third Party Plaintiff,

v.

AMERICAN RELIANCE INSURANCE COMPANY and Vik Brothers Insurance Company as successor to American Reliance Insurance Company, Third Party Defendants.

Civil Action No. 94–2279(CSF).

United States District Court, D. New Jersey.

Nov. 13, 1996.

Vincent R. McGuinness, Jr., Cozen & O'Connor, Westmont, NJ, for Excelsior Ins. Co.

Arthur S. Alexion, West Collingswood, NJ, for Pennsbury Pain Center.

Michael Marone, McElroy, Deutsch & Mulvaney, Morristown, NJ, for American Reliance, Vik Bros. Ins. Co. as successor to American Reliance Ins. Co.

## MEMORANDUM

WOLFSON, United States Magistrate Judge.

Presently before the Court is the motion by third party defendants, American Reliance ("American Reliance") and Vik Brothers Insurance Company ("Vik Brothers") as successor to American Reliance Insurance Company, (hereinafter jointly referred to as "American Reliance"), to set aside a settlement that was reached between Excelsior Insurance Company ("Excelsior") and Pennsbury Pain Center ("Pennsbury"). Pursuant to 28 U.S.C. 634(c), the parties have consented to this Court's jurisdiction to decide this dispositive motion. The Court has considered the moving, opposition, and reply papers submitted by the parties, supplemental certifications and briefs, and heard oral argument from counsel on September 30, 1996. For the following reasons, plaintiff's motion to set aside the settlement agreement is denied.

### Background

This case stems from a fire that occurred on October 25, 1992, in a multi-tenant commercial office building, located at 168 Franklin Corner Road in Lawrenceville, New Jersey, where Kaylor Chiropractic ("Kaylor") and Pennsbury were tenants. No one disputes that the fire originated in the utility room of an office suite leased to Pennsbury, and further, that as a result of this fire, the neighboring offices occupied by Kaylor suffered fire-related property damage.

Kaylor submitted a claim for $723,885 to its insurance company, Excelsior, for property damage and business interruption loss. Excelsior compromised Kaylor's claim by paying $572,767.78. Subsequently, Excelsior, as subrogee of Kaylor, filed the instant action against Pennsbury to recover its payment of Kaylor's claim.

Pennsbury requested that American Reliance, its insurer, defend and indemnify Pennsbury in this matter. (Tr. (November 17, 1995) at 4–12 to 5–6 and Corresponding Supplemental Submissions at 1 and 2). On August 18, 1994, American Reliance denied coverage and advised Pennsbury that it would not appoint counsel to defend Pennsbury. (Tr. (November 17, 1995) at 4–12 to 5–6; Excelsior Brief at 3). Thus, Pennsbury retained its own attorney, Arthur S. Alexion, Esq., to defend the claims. (Tr. (November 17, 1996) at 4–12 to 5–6 and Corresponding Supplemental Submissions at 2 and 3). On August 24, 1994, Pennsbury requested American Reliance reconsider its denial and further notified American Reliance that Pennsbury was considering a settlement with Excelsior as permitted by *Griggs v. Bertram*, 88 N.J. 347, 443 A.2d 163 (1982). (Tr. (November 17, 1995) at 5–4 to 5–6 and Corresponding Supplemental Submission at 3; Alexion Certification (September 4, 1996) at 2). American Reliance, however, maintained that it had no obligation to defend. (Alexion Certification (September 4, 1996) at 2). Thereafter, on September 29, 1994, Pennsbury filed a third party declaratory judgment action against American Reliance and Vik Brothers, as successor to American Reliance, seeking a determination that the third party defendants have a duty to defend and indemnify Pennsbury for Excelsior's claim.

Between October 3, 1994 and August 28, 1995, Excelsior and Pennsbury engaged in settlement negotiations, which are evidenced by the correspondence between the parties. (Excelsior Brief at 3 and Corresponding Exhibits A–C; Alexion Certification (September 4, 1956) at 1 and 34). Specifically, Excelsior claims that negotiations began on October 3, 1994, when it raised the issue of settlement as required by F.R.C.P. 26(f)[1]. (Excelsior Brief at 3). During the Rule 16 Initial Scheduling Conference on December 8, 1994, this Court was informed by Excelsior and Pennsbury that a settlement agreement, with terms consistent with *Griggs*, was being negotiated.

Excelsior then drafted a "Proposed Judgment Note and Settlement Agreement" which was sent to Pennsbury on December

---

1. Federal Rule of Civil Procedure 26(f) provides in pertinent part that "the parties shall, as soon as practicable and in any event at least 14 days before a scheduling conference is held or a scheduling order is due under Rule 16(b), meet to discuss the nature and the basis of their claims and defenses and the possibilities for a prompt settlement or resolution of the case ..."

28, 1994. (Excelsior Brief at 3 and Corresponding Exhibit A; Alexion Certification (September 4, 1996) at 3). The substance of the agreement was that Excelsior would release Pennsbury from all liability resulting from the fire in exchange for the assignment of Pennsbury's rights against its insurer, American Reliance. In response, on January 8, 1995, Mr. Alexion informed Excelsior's counsel that Pennsbury could not enter into a settlement agreement without first reviewing plaintiff's disclosure materials, pursuant to F.R.C.P. 26, and plaintiff's Experts' Reports. (Excelsior Brief at 3 and Corresponding Exhibit B; Alexion Certification (September 4, 1996) at 3). Excelsior complied with these requests for documents on January 11, 1995. (Excelsior Brief at 3; Alexion Certification (September 4, 1996) at 3). Subsequently, on January 31, 1995, Pennsbury responded to Excelsior's "Proposed Judgment Note and Settlement Agreement", indicating that it was agreeable to the settlement subject to three minor concerns. (Excelsior Brief at 3 and Corresponding Exhibit C; Alexion Certification (September 4, 1996) at 3).

Despite being notified that Pennsbury was contemplating a *Griggs* settlement in August of 1994, American Reliance did not object to the possibility of a settlement until March 15, 1995. (Alexion Certification (September 4, 1996) at 2; Tr. (November 17, 1996) at 5–4 to 5–6 and Corresponding Supplemental Submission at 5). However, Pennsbury maintained its right under *Griggs* to enter into a settlement. (Alexion Certification (September 4, 1996) at 2; Tr. (November 7, 1996) at 5–4 to 5–6 and Corresponding Supplemental Submission at 6). Shortly thereafter, on April 21, 1995, Excelsior claims that the agreement was modified to include Pennsbury's changes, finalized, signed by Excelsior and sent to Pennsbury for its ratification. (Excelsior Brief at 4). Both Pennsbury and Excelsior contend that the settlement agreement was formed as of April 21, 1995, although it was not yet formally signed by Pennsbury or approved by the court, as required by *Griggs v. Bertram*, 88 N.J. 347, 443 A.2d 163 (1982). (McGuinness Certification (September 25, 1996) at 2, ¶ 3; Alexion Certification (September 4, 1996) at 3).

Mr. Alexion, counsel for Pennsbury, and Mr. McGuinness, counsel for Excelsior, have further certified that, from April 21, 1995 until the settlement hearing, there were no changes or discussions regarding the substance of the agreement. (McGuinness Certification at 2, ¶ 4; Alexion Certification (September 25, 1996) at 1, ¶ 2). The only discussions that the parties engaged in during this period concerned the timing of the hearing. (McGuinness Certification at 2, ¶¶ 4 and 5; Alexion Certification (September 25, 1996) at 1, ¶ 2). Specifically, Mr. Alexion and Mr. McGuinness discussed scheduling the settlement approval hearings, for the convenience of all the parties and the Court, to coincide with the Final Pretrial Conference[2] which was originally scheduled for September 7, 1995. (McGuinness Certification at 2, ¶ 5, Alexion Certification at 1, ¶ 2). The Final Pretrial Conference, however, was rescheduled three times. Prior to the October 20, 1996 rescheduled date, in a letter dated October 9, 1995, Excelsior informed this Court of the settlement and that the agreement required Court approval in accordance with the parameters established in *Griggs v. Bertram*.[3] This Court then scheduled the hearing to be held on November 17, 1995, the date of the Final Pretrial Conference. At that time, the parties believed that the hearings would be completed in a half day.

In accordance with *Griggs v. Bertram*, this Court commenced the settlement hearing on November 17, 1995. Counsel for all parties, including American Reliance, participated. Before the start of the hearing, Eli Eytan, Esq., attorney for American Reliance, indi-

---

2. Although Pennsbury and Excelsior had already reached a settlement agreement, the Final Pretrial Conference was necessary because the remaining third party claims against American Reliance were still scheduled to be litigated.

3. Both Mr. McGuinness, counsel for Excelsior, and Mr. Alexion, counsel for Pennsbury, certify that the agreement which was presented to the Court on October 9, 1995 and signed by Pennsbury on that date, is the original agreement entered into on April 21, 1995. (McGuinness Certification at 2, ¶ 3; Alexion Certification (September 25, 1996) at 1), ¶ 1.

cated his intent to reserve his right to object to the reasonableness of the settlement after reviewing the appropriate materials. (Tr. (November 17, 1995) at 3–17 to 3–23). Thus, the Court agreed to limit the hearings on that date to the witnesses being presented by Pennsbury. (*Id.* at 3–24 to 4–2). The right of Mr. McGuinness, attorney for Excelsior, to present witnesses, and Mr. Eytan to cross examine those witnesses and present his own, was preserved. (*Id.* at 4–2 to 4–11). A continued date of January 22, 1996 was set for those proceedings. *Id.*

On November 17, 1995, Pennsbury offered the testimony of Irvin Reiss, C.E.O. of Pennsbury, on the issue of the reasonableness and the bona fides of the settlement. (Tr. (November 17, 1995) at 5–19 to 20–1). Mr. Reiss confirmed that Pennsbury considered several factors in deciding to enter into a settlement agreement with Excelsior. Among these factors were: Pennsbury's desire to achieve finality on the claims, (*Id.* at 9–8 to 9–13); the cause/origin assessments in the various fire reports which pointed to Pennsbury's office suites as the origin of the fire, (*Id.* at 12–9 to 12–23); American Reliance refused to defend, leaving Pennsbury to retain its own attorney and pay for its own defense, (*Id.* at 7–13 to 7–14 and 9–14 to 9–19); the possibility that Kaylor might prevail, (*Id.* at 9–23 to 9–25 and 13–9 to 14–2); and that there were other sizeable claims being asserted against it, (*Id.* at 10–15 to 12–8). Reiss further testified that he made no attempts to compromise Excelsior's claim because he understood that the claim was for an amount less than Kaylor originally submitted and as such, he believed it to be accurate since it was his experience that insurance companies undertake close scrutiny of damage claims before entering into settlement. (*Id.* at 18–2 to 19–17). Finally,

Reiss clarified that, although Pennsbury didn't pursue an independent investigation of the amount of Excelsior's claim, he did receive all of the relevant documentation concerning the claim and nothing in his evaluation, or in anything conveyed to him, indicated that Excelsior's claim was in any way unreasonable or excessive. (*Id.* at 14–3 to 15–4).

On the second day of hearings, January 22, 1996,[4] Excelsior presented the testimony of John Wolfersberger, a property adjuster hired by Excelsior to evaluate Kaylor's claims, as well as Richard Lubitz and Barry Feinberg, certified public accountants retained by Wolfsberger to evaluate the detailed claim submission of Kaylor.[5] (Tr. (January 22, 1996) at 3–22 to 95–22). Wolfsberger's testimony focused on the process and basis used to reduce Kaylor's claim from $723,885 to $572,767.78. Wolfsberger testified that, after detailed scrutiny of Kaylor's receipts and records, verifying this information with the various vendors, inspecting the damages to identify the cause/origin and what goods were salvageable in order to ultimately determine the business personal property loss, and evaluating the reports of the certified public accountants, Lubitz and Feinberg, which provided a detailed analysis of the business interruption loss,[6] the total amount of Kaylor's loss amounted to $572,767.78. (*Id.* at 10–22 to 18–3; 25–18 to 29–10; 33–16 to 33–18; and 34–14 to 36–3).

After the second day of hearings, on February 14, 1996, Michael Marone, Esq. of McElroy, Deutsch & Mulvaney, substituted for Eli Eytan, Esq., as counsel for American Reliance. In a telephone conference call held on February 21, 1996, Mr. Marone requested an adjournment of the continued hearing date to allow for further depositions

4. On November 21, 1995, after the *Griggs* proceedings had already commenced, the Honorable Clarkson S. Fisher, U.S.D.J., granted partial summary judgment in favor of Pennsbury, and ordered American Reliance to defend Pennsbury for Kaylor's claim for property damage resulting from the fire.

5. Kaylor's claim submission was formulated by Dr. Kaylor, Anthony Rocca, an adjuster and Richard Rubeck, a certified public accountant.

(Tr. (January 22, 1996) at 9–12 to 9–21 and Corresponding Exhibit D).

6. The business interruption loss calculation was based on a comparison of prior periods to determine sales trends, an analysis of Kaylor's tax returns and patient billing and other patient records, verifying these records, and subtracting specific amounts to account for uncollectibles. (Tr. (January 22, 1996) at 41–11 to 57–3 and 79–2 to 93–1).

and the retention of an expert for American Reliance. The Court granted Mr. Marone's application and postponed the continuation of the proceedings from February, 1996 to March, 1996.

On the final day of hearings, March 19, 1996, American Reliance called its witnesses: Dr. Kaylor, who owned and operated Kaylor Chiropractic, as well as American Reliance's experts, Michael Heddon, a real estate appraiser/broker, and Eugene T. Carey, a certified public accountant. (Tr. (March 19, 1996)). Dr. Kaylor testified regarding his efforts to re-establish his practice after the fire occurred. (Tr. (March 19, 1996) at 5–14 to 45–20). American Reliance's first expert, Michael Heddon, performed a real estate survey of the available space in the Lawrenceville area. (*Id.* at 48–7 to 48–21). Based on this survey, Mr. Heddon concluded that Kaylor could have potentially relocated in the immediate area, thereby possibly avoiding a portion of his claimed business interruption losses. (*Id.* at 48–22 to 52–8). Admittedly, Heddon did not take Kaylor's special needs or considerations into account when he conducted his analysis. *Id.* at 52–19 to 61–20. Similarly, the second expert, Eugene Carey, testified, *inter alia* that Kaylor's business interruption losses, based on a three month sales trend analysis, totaled $332,609, approximately $188,731 less than Excelsior's business loss calculations. (*Id.* at 67–20 to 83–14; 97–2 to 97–9). Carey, too, conceded that he did not take Kaylor's special circumstances into account in drawing his conclusions. (*Id.* at 87–6 to 87–25; 92–15 to 92–19).

At the conclusion of the hearing on March 19, 1996, Mr. Alexion informed the Court and counsel, that, approximately six months before, on September 11, 1995, Pennsbury had filed a Voluntary Petition for protection under Chapter 11 of the United States Bankruptcy Code. (Tr. (March 19, 1996) at 136).

Pennsbury had never communicated this fact to any counsel or the Court.[7] The Court directed the parties to evaluate this newly discovered fact and its impact on the hearings. Subsequently, on June 4, 1996, the Bankruptcy Court approved Pennsbury's reorganization and lifted the stay, thereby permitting this matter to go forward.

American Reliance contends that Pennsbury's failure to sign the settlement agreement and gain the court's approval prior to the September 11, 1995 bankruptcy petition, precludes Pennsbury from subsequently adopting the agreement since it would be in violation of the automatic stay provisions of the Bankruptcy Code. (American Reliance Brief at 7). American Reliance further contends that even if the settlement agreement is held to be valid despite the automatic stay provisions, the agreement should not be approved by the Court because it is unreasonable and was not the product of good faith negotiations. (American Reliance Brief at 9). Thus, American Reliance urges this Court to find that the agreement fails to satisfy the *Griggs* standard. *Id.*

Conversely, both Pennsbury and Excelsior assert that the settlement agreement was finalized on April 21, 1995, and therefore, is not affected by the September 11, 1995 bankruptcy petition. (Excelsior Reply Brief at 4; Alexion Certificaton at 4–5). Further, they insist that the settlement agreement was reasonable and negotiated in good faith; thereby satisfying the *Griggs* standard. *Id.*

### Discussion

**1. The Settlement Agreement**

■■■ As a preliminary matter, this Court must determine when a settlement agreement rises beyond mere negotiations to the level of becoming binding and enforceable on the parties. State law governs the construc-

---

**7.** Mr. Alexion, Pennsbury's counsel, inadvertently learned of Pennsbury's bankruptcy on March 12, 1996, just seven days before the final day of the *Griggs* hearings. (Alexion Certification (September 4, 1996) at 4). The following day, March 13, 1996, Mr. Alexion notified all counsel of this newly discovered fact. *Id.* The Court, however, was not advised of Pennsbury's bankruptcy status until the conclusion of the *Griggs* hearings on March 19, 1996.

Interestingly, in its statement of Financial Affairs filed with the Bankruptcy Court on October 11, 1995, Pennsbury represented to the court that it was not a party to any lawsuits within the year immediately preceding the filing of its bankruptcy petition. (See Statement of Financial Affairs at 2, attached to Marone Certification at Exhibit B).

tion and enforcement of settlement agreements in federal court. *Langella v. Anderson*, 734 F.Supp. 185, 191–92 (D.N.J. 1990); *Isidor Paiewonsky Assoc., Inc. v. Sharp Properties, Inc.*, 761 F.Supp. 1231, 1233 (D.Vi.1991). Here, New Jersey law applies and holds that "an agreement to settle a lawsuit is a contract which, like all other contracts, may be freely entered into, and which a court, absent a demonstration of 'fraud or other compelling circumstance' shall honor and enforce as it does other contracts." *Pascarella v. Bruck*, 190 N.J.Super. 118, 124–25, 462 A.2d 186 (App.Div.1983) (quoting *Honeywell v. Bubb*, 130 N.J.Super. 130, 136, 325 A.2d 832 (App.Div.1974)); *See also Cooper–Jarrett, Inc. v. Central Transport, Inc.*, 726 F.2d 93, 96 (3d Cir.1984) (citing *Green v. John H. Lewis & Co.*, 436 F.2d 389, 390 (3d Cir.1970)) (" 'An agreement to settle a lawsuit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the Court, and even in the absence of a writing.' … That is the settlement agreement is itself a contract, separate and independent from the dispute giving rise to the lawsuit which is settled. "); *See also Pascarella v. Bruck*, 190 N.J.Super. at 124, 462 A.2d 186 (citing *Good v. Pennsylvania R.R.* 384 F.2d 989, 990 (3d Cir.1967)). Thus, New Jersey's basic contract principles of law apply.

■ Traditional contract law rules provide that a contract arises from the manifest intentions of the parties to engage in an offer and acceptance of sufficiently definite essential terms. *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435, 608 A.2d 280 (1992) (citations omitted); *See also Friedman v. Tappan Development Corporation*, 22 N.J. 523, 531, 126 A.2d 646 (1956). To be enforceable, a contract must also be accompanied by consideration. *Friedman*, 22 N.J. at 533, 126 A.2d 646. In bilateral contracts or agreements, such as the one in the case at hand, where the parties make mutual promises to do some future act, "the consideration of the promise of one party is a promise on the part of the other." *Id.*

■ Despite these strict requirements, parties may bind themselves by an informal memorandum, even though they contemplate the execution of a more formal document. *Berg Agency v. Sleepworld–Willingboro, Inc.*, 136 N.J.Super. 369, 374, 346 A.2d 419 (1975). "[I]f the negotiations are finished and the contract between the parties is complete in all its terms and the parties intend that it shall be binding, then it is enforceable, although lacking in formality and although the parties contemplate that a formal agreement shall be drawn and signed." *Moran v. Fifteenth Ward Bldg. & Loan Ass'n.*, 131 N.J.Eq. 361, 366, 25 A.2d 426 (N.J.Ch.1942). Thus, so long as the parties agree upon the essential terms of a settlement, leaving the details to be "fleshed out" in a writing thereafter, courts will enforce settlement agreements notwithstanding the absence of a future writing. *Lahue v. Pio Costa*, 263 N.J.Super. 575, 596, 623 A.2d 775 (App.Div. 1993) (citing *Bistricer v. Bistricer*, 231 N.J.Super. 143, 145, 555 A.2d 45 (Ch.Div. 1987)); *Hagrish v. Olson*, 254 N.J.Super. 133, 138, 603 A.2d 108 (App.Div.1992) (quoting *Berg Agency v. Sleepworld–Willingboro, Inc.*, 136 N.J.Super. 369, 377, 346 A.2d 419 (App.Div.1975)) (" 'So long as the basic essentials are sufficiently definite, any gap left by the parties should not frustrate their intention to be bound.' "); *See also Peskin v. Peskin*, 271 N.J.Super. 261, 274–75, 638 A.2d 849 (App.Div.1994); *Nolan v. Lee Ho*, 120 N.J. 465, 472, 577 A.2d 143 (1990); *Hannigan v. Township of Old Bridge*, 288 N.J.Super. 313, 672 A.2d 257 (App.Div.1996).

■ In the instant case, it is undisputed that Excelsior and Pennsbury were engaged in negotiations between October 3, 1994 and April 21, 1995. The correspondence between the parties during this time period indicates that Excelsior did make an offer for settlement in the form of the "Proposed Judgment Note and Settlement Agreement." The stated consideration in the agreement was that Excelsior would release Pennsbury from any liability due to the fire in exchange for an assignment of Pennsbury's rights against its insurer, American Reliance/Vik Brothers.[8]

---

**8.** These types of settlement agreements are entirely appropriate under *Griggs v. Bertram*, 88

N.J. 347, 369–70, 443 A.2d 163 (1982) ("An insured tortfeasor should be able to reach an

This constitutes consideration under the law. *See Griggs*, 88 N.J. at 369–70, 443 A.2d 163.

■ Upon receipt of this offer, Pennsbury requested certain disclosure materials from Excelsior which were necessary to evaluate the agreement. Once these materials were received, Pennsbury considered the proposal and manifested an intent to be bound, by indicating that it was agreeable to the proposal subject to certain minor modifications. Thus, Pennsbury proposed a counter-offer.[9] Excelsior then incorporated the requested modifications, finalized, and signed the agreement. These acts evidence acceptance of Pennsbury's counter-offer.

After signing the agreement, Excelsior sent it to Pennsbury for its signature on April 21, 1995. Both Pennsbury and Excelsior claim that they intended the agreement to be finalized on April 21, 1995, even though Pennsbury did not sign it on that date.

Furthermore, it is clear from the certifications and correspondence between the parties, as well as the representations to this Court, *see supra*, at 345–346, that, at all relevant times, Excelsior and Pennsbury intended to reach a settlement agreement. Thus, this Court, recognizing that "the essential element to the valid consummation of a contract is a meeting of the minds of the contracting parties," finds that a contract has been formed. *De Vries v. Evening Journal Association*, 9 N.J. 117, 119–20, 87 A.2d 317 (1952).

American Reliance contends, however, that there was no agreement on April 21, 1995, because the April 21, 1995 letter from Excelsior to Pennsbury concerning the settlement agreement allegedly contains some conditional language. Specifically, the letter states: "Enclosed please find the revised language in the Stipulation of Judgment and Settlement Agreement. If your client now approves the language, please advise. We will have the agreement signed and will schedule a hearing before Judge Wolfson for approval. s/Vincent McGuinness, Jr." That Mr. McGuinness incorporated Pennsbury's revisions and returned the signed agreement but sought "approval" of the language used in drafting Pennsbury's requested revisions and not the substantive elements of the agreement, does not make the agreement less of an accord. The Certifications of both Mr. Alexion and Mr. McGuinness corroborate the position that it was Excelsior and Pennsbury's unequivocal intent to enter into a settlement agreement on April 21, 1995.[10] Therefore, this court concludes that the

agreement relieving it of liability when its carrier wrongfully declines to defend.").

9. The Second Restatement of Contracts indicates that such counter-offers are common. 2d Restatement of Contracts, § 39 (1979). The Restatement defines a counter-offer as an offer made by an offeree which is capable of being accepted by the original offeror. *Id.* This process works towards continuing negotiations rather than terminating them. *Id.* "A common type of counter-offer is the qualified or conditional acceptance, which purports to accept the original offer but makes acceptance expressly conditional on assent to additional or different terms." *Id.* at comment b.

New Jersey courts routinely consult the Restatement Second of Contracts for guidance in determining contract issues and have adopted the Restatement's general rules concerning counter-offers. *See Presbyterian Homes of Southern New Jersey v. Montoro*, 1988 WL 52245 at 3 (D.N.J.1988) ("[a] qualified or conditional acceptance containing terms and conditions not found in the original proposal may operate as a counteroffer ..."). *See also, Larsen & Fish, Inc. v. Schultz*, 5 N.J.Super. 403, 405, 69 A.2d 328 (App.

Div.1949) ("A reply to an offer, although purporting to accept it, which adds qualifications or requires performance of conditions, is not an acceptance but is a counteroffer."); *In re Marcalus Mfg., Co., Inc.*, 120 F.Supp. 784 (D.N.J.1954).

10. At oral argument on September 30, 1996, American Reliance made a final attempt to establish that the case was not settled on April 21, 1995 or even as of August 28, 1995. American Reliance found it suspect that the extensive, detailed Final Pretrial Order that was submitted by the parties on August 28, 1995 was devoid of any statements indicating that a settlement was reached or even contemplated. This, however, does not establish that a settlement was not reached prior to August 28, 1995. Counsel for Excelsior explained that the Final Pretrial Order was drafted as a safety measure, in light of the possibility that the settlement might not be approved at the *Griggs* hearing. In that event, the parties would then have to continue to trial. Furthermore, the third party claims were still viable. Thus, the fact that Excelsior did not include a statement concerning settlement in the Joint Final Pretrial Order is not evidence that there was no settlement prior to the hearings.

agreement to settle became effective on that date.

Having determined that a valid settlement agreement was formed as of April 21, 1995, this court must now consider the effect of plaintiff's subsequent bankruptcy and whether the settlement agreement can satisfy the *Griggs* standard.

## 2. Effect of Bankruptcy Petition on Settlement Agreement [11]

 ██ American Reliance contends that the settlement agreement between Pennsbury and Excelsior was entered into in violation of the automatic stay provisions of 11 U.S.C. § 362, and therefore it should be set aside as void *ab initio*. Unknown to the Court, or to any counsel in this case, the *Griggs* hearings to consider the settlement agreement were conducted despite the pendency of Pennsbury's bankruptcy petition. The bankruptcy code, 11 U.S.C. § 362(a)(1), prohibits the commencement or continuation of any non-bankruptcy court's judicial proceedings to recover a claim against the debtor that arose prior to the bankruptcy.[12]

---

**11.** In supplemental papers submitted after oral argument, American Reliance questioned this Court's jurisdiction to hear these claims since the decisions in this case implicate bankruptcy issues which American Reliance contends are within the sole jurisdiction of the bankruptcy courts. (Supplemental Brief at 7–8). "Jurisdiction over Title 11 matters 'lies with the district court'. However, the district court routinely refers most bankruptcy cases to the bankruptcy court." *In re The Guild and Gallery Plus, Inc.*, 72 F.3d 1171, 1175 (3d Cir.1996) (quoting *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 264 n. 3 (3d Cir.1991) (citation omitted)). It is thus, "well settled that the bankruptcy court potentially has jurisdiction over four types of title 11 matters, pending referral from the district court: (1) cases under title 11, (2) proceedings arising under title 11, (3) proceedings arising in a case under title 11, and proceedings related to a case under title 11." *Id.* (emphasis added). In essence, the bankruptcy court's power stems from the district courts. Consequently, district courts are entitled to retain this power if they so choose. In the present case, this Court, pursuant to the consent of the parties, sits in the posture of a district court. As such, based on the reasoning in *In re The Guild and Gallery Plus, Inc.*, this Court chooses to retain its power to consider the disputed issues.

This Court's decision to maintain jurisdiction over all of the disputed issues is rendered in light

---

Chapter 11, § 362(a) of the United States Bankruptcy Code states:

### § 362. Automatic Stay

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3)), operates as a stay, applicable to all entities, of—

 (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

 * * * * * *

 (3) any act to obtain possession of property of the estate or of property

of the understanding that the central issue before this Court is whether the settlement entered into between Pennsbury and Excelsior is reasonable and made in good faith. The settlement agreement at issue is not even affected by Pennsbury's bankruptcy because it does not deal with any proceeds or assets of Pennsbury's estate, but implicates insurance proceeds that are available, if at all, to Excelsior, not Pennsbury. *See infra*, at 352–355. Therefore, in the interests of justice and judicial economy—having already conducted the *Griggs* hearing—this Court finds it prudent to consider the possible bankruptcy issues.

**12.** Excelsior, in analyzing the effect of Pennsbury's bankruptcy on the *Griggs* hearings, claims that the bankruptcy does not impact upon the settlement proceedings since the proceedings do not satisfy the standard established in § 362(a)(3). Specifically, Excelsior points out that § 362(a)(3) operates as a stay of any act to obtain possession of property of the debtor's estate. Relying on § 362(a)(3), Excelsior concludes that since the settlement agreement authorizes the assets of the insurance policy to go directly to Excelsior, the proceeds are not property of the debtor's estate and are therefore not subject to the bankruptcy stay pursuant to § 362(a)(3). Excelsior fails, however, to address the applicability of § 362(a)(1), which this court also finds to be a relevant provision in assessing the effect of Pennsbury's bankruptcy.

from the estate or to exercise control over property of the estate;

\* \* \* \* \* \*

Since this Court has determined that the settlement agreement between Excelsior and Pennsbury was formed and binding upon the parties on April 21, 1995, five months prior to the filing of Pennsbury's bankruptcy petition in September, 1995, the agreement is not affected by Pennsbury's subsequent bankruptcy. The question remains whether the *Griggs* hearings, based upon the settlement agreement, are void.

It is well-settled that the scope of the automatic stay is broad. *See Association of St. Croix Condominium Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir.1982) ("All proceedings are stayed, including ... judicial proceedings. Proceeding in this sense encompasses civil actions ..."); *Maritime Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194 (3d Cir.1991). "Absent relief from the stay, judicial actions and proceedings against the debtor are void *ab initio.*" *Maritime*, 959 F.2d at 1206 (citing *Kalb v. Feuerstein*, 308 U.S. 433, 438–40, 60 S.Ct. 343, 345–47, 84 L.Ed. 370 (1940)); *See also In re Trump Taj Mahal Associates v. Alibraham*, 156 B.R. 928, 942 (D.N.J.1993). The Third Circuit in *Maritime*, concluded that during the pendency of the debtor's bankruptcy proceeding, "the parties themselves could not validly undertake any judicial action ..." *Maritime*, 959 F.2d at 1207, n. 3.

Since *Maritime*, the Third Circuit has revisited the issue of whether judicial proceedings conducted in violation of the automatic stay are void *ab initio* or simply voidable. *See, e.g., In re Siciliano*, 13 F.3d 748, 750 (3d Cir.1994). While recognizing the "general principle" articulated in *Maritime*, that any creditor action taken in violation of the automatic stay is void *ab initio*, nonetheless, the Third Circuit has noted that there may be situations which warrant exception to this rule. *Id.* To this end, the Third Circuit has held that 11 U.S.C. § 362(d) [13] affords courts an opportunity to cure acts that are otherwise void under the automatic stay. *Id.* at 751. Specifically, the Circuit Court found that "... the inclusion of the word 'annulling' in the statute, indicates a legislative intent to apply certain types of relief retroactively and validate proceedings that would otherwise be void *ab initio.*" *Id.* In drawing this conclusion, the Third Circuit approvingly acknowledged the Fifth Circuit's holding that "[t]he power to annul authorizes the court to validate actions taken subsequent to the impressing of the section 362(a) stay." *Id.* (quoting, *Sikes v. Global Marine, Inc.*, 881 F.2d 176, 178 (5th Cir.1989)).

▮ Hence, although technically the judicial proceedings to enforce the settlement were conducted in violation of the automatic stay provisions of 11 U.S.C. § 362(a)(1), this Court, relying on *In re Siciliano*, has the option of validating the *Griggs* proceedings, pursuant to 11 U.S.C. § 362(d), in the interests of equity and judicial economy, or requiring the parties to repeat the approval hearings, now that Pennsbury's reorganization is complete and the stay has been lifted.

In assessing these options, this Court is mindful of the fact that American Reliance does not contend that the bankruptcy hindered its efforts in any way to object to the reasonableness of the settlement. Indeed, counsel for American Reliance was present and actively participated in the *Griggs* hearings. The record indicates that American Reliance's counsel had a sufficient opportunity to cross-examine the witnesses produced by both Pennsbury and Excelsior and presented his own witnesses. Recognizing that repeating the hearings would be needlessly costly, duplicative, time consuming and fruitless, this Court finds that in the interests of equity and judicial economy, the *Griggs* hearings, held while the automatic stay was in

---

**13.** 11 U.S.C. § 362(d) provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or (2) with respect to a stay of an act against property under subsection (a) of this section, if—(A) the debtor does not have equity in such property; and (B) such property is not necessary to an effective reorganization."

effect, should be validated and given full effect.

■ In addition, it should be noted that the automatic stay "is intended to protect the debtor from its creditors and to permit time to formulate a workable plan of reorganization and payment." *Zenith Laboratories, Inc. v. Sinay,* 104 B.R. 659, 661 (D.N.J.1989) (noting that the Code recognizes that there is frequently a need to respond to other interests and permits a flexible approach to the stay as circumstances may require). Here, it is the debtor, Pennsbury, who seeks to validate the *Griggs* hearings since the settlement would protect it from future liability to Excelsior. Thus, validation of the proceedings is consistent with the underlying policy considerations of the automatic stay provisions in the bankruptcy code, which endeavor to protect the debtor.

Additionally, this decision is in accord with 11 U.S.C. § 362(d)(2). This section permits a debtor to seek retroactive relief from a stay against property under subsection (a) if "the debtor does not have an equity in such property and such property is not necessary to an effective reorganization." Property, under 11 U.S.C. § 541, is defined as:

§ 541 Property of the Estate

(a) ... Such estate is comprised of all of the following property, wherever located and by whomever held:

(1) ... all legal or equitable interests of the debtor in property as of the commencement of the case.

* * * * * *

(6) Proceeds, product, offspring, rents or profits of or from property of the estate, except ...

11 U.S.C. § 541(a) (1978).

■ Property, under the bankruptcy statute, may include the debtor's "interests" in any insurance policies. *See First Fidelity Bank v. McAteer,* 985 F.2d 114 (3d Cir.1993). However, ownership of an insurance policy "does not necessarily entail ownership of the proceeds of that policy." *Id.* at 117 (finding that several different parties may have an interest in a life insurance policy, including the owner, insured, and the beneficiary).

"The estate in bankruptcy only includes property to which the debtor would have had a right if the debtor were solvent." *Id.* at 117; *See also In re Louisiana World Exposition, Inc.,* 832 F.2d 1391, 1401 (5th Cir.1987) (cited with approval by the Third Circuit in *First Fidelity Bank,* 985 F.2d at 117)

In *In re Louisiana,* the Fifth Circuit distinguished between right of ownership of a liability insurance policy and the right to the "proceeds" of the policy. *In re Louisiana World,* 832 F.2d at 1401. In concluding that the debtor had no ownership interest in any proceeds of the policy, the court compared the facts in that case to cases like the one at hand, where the debtor assigns away the proceeds of an insurance policy. *In re Louisiana,* 832 F.2d at 1401. Specifically, the court held that "when a purchaser of an insurance policy assigns its proceeds elsewhere, the assignee or beneficiary owns the proceeds, and the bankrupt's estate does not." *Id.; See also In re Moskowitz,* 14 B.R. 677, 680–81 (Bankr.S.D.N.Y.1981) (holding that proceeds of a medical insurance policy that had been assigned to the hospital that treated the debtor was not property of the estate).

■ Like *In re Louisiana World,* the insurance proceeds in the instant case should not be considered assets of the debtor Pennsbury's estate. Here, Pennsbury has assumed liability for the fire that occurred in its office suites. As such, Pennsbury is obligated to pay Excelsior, as subrogee for Kaylor, the damages incurred by Kaylor. Pennsbury's insurer, American Reliance, is obligated to defend Pennsbury. Furthermore, any insurance proceeds due on the Pennsbury policy for Excelsior's claim would be payed directly to Excelsior, the injured party, and would not be paid to Pennsbury.

More importantly, the settlement agreement provides for the assignment of Pennsbury's interest against its insurer, American Reliance, to Excelsior. Since the agreement was established as of April 21, 1995, prior to Pennsbury's bankruptcy, the interest is not property of Pennsbury's estate. Thus, because "[a]n insurance policy purchased by the debtor is only an asset to the extent that it increases the debtor's worth or diminishes

its liabilities," these insurance proceeds are not properly within the debtor's estate. *Zenith*, 104 B.R. at 665. Hence, Pennsbury does not retain any equitable interests in these proceeds and, as such, the property is not necessary for the effective reorganization of Pennsbury's estate.

In a final attempt to nullify the settlement agreement, American Reliance, relying upon *In re Columbia Gas System, Inc.*, 50 F.3d 233 (3d Cir.1995), argues that even if the proceedings are determined valid, the agreement constitutes an executory contract, which is deemed rejected pursuant to 11 U.S.C. § 365 and Pennsbury's plan of reorganization. (American Reliance Supplemental Brief at 5). *See* 11 U.S.C. § 365 ("the trustee [in bankruptcy], subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.") American Reliance contends that the settlement agreement between Pennsbury and Excelsior is executory since, at the time of Pennsbury's bankruptcy, it had not obtained this Court's approval of the settlement. (American Reliance Supplemental Brief at 6). Consequently, American Reliance submits that the agreement to settle, as an executory contract, should have been either accepted or rejected in Pennsbury's reorganization plan. (*Id.* at 7). Because the contract was neither specifically accepted nor rejected in Pennsbury's plan, American Reliance argues that the contract is governed by the default provisions of the plan. *Id.* The pertinent default provision states: "All executory contracts and unexpired leases that are not assumed pursuant to paragraphs 5.1 and 5.2 above and which have not been otherwise assumed or rejected during this reorganization proceeding shall be deemed rejected pursuant to Section 365 and 1123(b)(2) of the Bankruptcy Code upon the Confirmation Date." *See* Pennsbury's Plan of Reorganization at Article V. Thus, American Reliance concludes, the settlement agreement is deemed rejected and Excelsior is out of time to assert any claim against Pennsbury. (American Reliance Supplemental Brief at 7). This Court disagrees.

"[An executory contract is] a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute material breach excusing performance of the other." *In re Columbia Gas System Inc.*, 50 F.3d at 239 (quoting *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3d Cir.1989)). The settlement agreement in the instant case is not executory.

Here, the agreement provided that Excelsior would release Pennsbury from any liability due to the fire in exchange for any interest that Pennsbury might have in its third party action against American Reliance. As this court has already determined, this agreement was formed on April 21, 1995. The parties had no additional obligations to perform. Furthermore, the settlement agreement contained no qualifying or conditional language. Specifically, there was no language that the settlement agreement was "subject to final court approval" or the equivalent, unlike the language found in the agreement examined in *In re Columbia Gas System Inc.*, 50 F.2d at 242 (holding that "... 'final Court approval' was the linchpin of the contract ...," and as such the contract was executory until it received the approval). Thus, the agreement is not executory, although the Court could subsequently nullify the agreement if it found that it did not satisfy the *Griggs* standard.

This Court concludes that Pennsbury's intervening bankruptcy does not provide a basis for voiding the agreement reached between Excelsior and Pennsbury nor does it nullify the *Griggs* hearings. Thus, the Court is now left to determine the reasonableness and *bona fides* of the settlement.

**3. The Agreement Satisfies the *Griggs* Standard**

Generally, there is no legal requirement that settlement agreements made between competent adults must be approved by a court, "and the practice of spreading the terms of the agreement upon the record, although a familiar practice, is not [generally] a procedure requisite to enforcement." *Pascarella v. Bruck*, 190 N.J.Super. 118, 462 A.2d 186 (App.Div.1983). There are, howev-

er, certain limited instances where court approval is required prior to enforcement. This case presents such an instance.

It is well-settled New Jersey law that where an insurer fails to defend an insured, "a settlement [entered into by the insured and a third party] may be enforced against an insurer ... if it is reasonable in amount and entered into in good faith." *Griggs v. Bertram*, 88 N.J. 347, 368, 443 A.2d 163 (1982). In evaluating these factors, the New Jersey Supreme Court further detailed that the "[t]he initial burden of going forward with proofs of these elements rests upon the insured and the ultimate burden of persuasion as to these elements is the responsibility of the insurer." *Id.* Thus, the insured has the primary burden of proving that the settlement was *prima facie* reasonable in amount and untainted by bad faith. *Id.* at 367, 443 A.2d 163. The New Jersey Supreme Court recognized that the burden should not rest entirely upon the insured. The Court reasoned that:

> Since, however, the insurer by its unfair dealing has imposed upon the insured the full burden of protecting its own interests and has placed it in the difficult predicament of attempting on its own to secure the benefits of insurance under the policy, the insurer should not be free of the burden of persuasion on the question of its ultimate responsibility to pay. It should, therefore, be required to sustain the ultimate and major burden of demonstrating, by a preponderance of the evidence, that it is not liable because the settlement is neither reasonable nor reached in good faith. *Griggs*, 88 N.J. at 367–68, 443 A.2d 163.

The underlying facts in *Griggs* are instructive. Griggs and Bertram were engaged in a dispute while attending a school basketball game. *Id.* at 353, 443 A.2d 163. The two exchanged words and blows, which ultimately resulted in injury to Griggs. *Id.* Griggs subsequently filed a claim for personal injuries. *Id.* Bertram admitted punching Griggs and

sought the aid of his insurer, Franklin Mutual, to defend against Griggs' claims. *Id.* After the insurer refused to investigate or defend, Bertram instituted a third party action against Franklin Mutual seeking to hold the insurer responsible under the insurance policy. *Id.* at 354, 443 A.2d 163. While that action was pending, Griggs and Bertram entered into a settlement agreement, in which Bertram assigned his interest in his third party action against Franklin Mutual in exchange for a release from personal liability. *Id.* Ultimately, the New Jersey Supreme Court found that these types of agreements are valid provided that they are both reasonable and entered into in good faith. *Id.* at 368, 443 A.2d 163.[14]

Several other courts have also addressed the enforceability of settlements against an insurer who did not participate in the settlement negotiations. *See Jefferson Insurance Company v. Health Care Insurance Exchange*, 247 N.J.Super. 241, 588 A.2d 1275 (App.Div.1991); *New Jersey Mfrs. Indemnity Ins. Co. v. United States Casualty Company*, 91 N.J.Super. 404, 220 A.2d 708 (App. Div.1966); *Employers Mutual Liability Ins. Co. of Wis. v. Hendrix*, 199 F.2d 53 (4th Cir.1952). In *Employers Mutual*, the insured brought suit against his insurer, Employers Mutual, to recover the sum of $20,000 plus fees paid by the insured in compromise of claims for damages for charges of assault, battery and slander. *Employers Mutual*, 199 F.2d at 54. Although this case is not factually similar to the case at hand, the court's analysis of the reasonableness of the settlement is instructive. In finding that the settlement was unreasonable, the court noted that no witness with personal knowledge was called to testify and the alleged wrongdoer was neither examined as a witness nor questioned as to whether the charges against him were true. *Id.* at 59. In arriving at the determination that the compromise was unreasonable, the court held that "in every case

---

14. The Court was not confident, however, that the facts in that case indicated that the settlement satisfied the requisite standard. *Griggs*, 88 N.J. at 368–69, 443 A.2d 163. In particular, the Court found it significant that the insured failed to conduct a basic physical examination or deposition of Griggs and that the insured did not question the factual basis of the amount of settlement. *Id.* at 368–69, 443 A.2d 163. The case was remanded to the trial court for a determination in accordance with the established standard.

of settlement before judgment the reasonableness of the compromise is a proper subject of inquiry which cannot be answered without some examination into the merits of the claim." *Id.* at 60.

In an effort to clarify the standard of reasonableness and good faith required in cases such as these, the court in *Luria Brothers & Co., Inc. v. Alliance Assurance Co., Ltd.,* 780 F.2d 1082, 1091 (3d Cir.1986), directed that "[i]n order to recover the amount of the settlement from the insurer, the insured need not establish actual liability to the party to whom it has settled so long as a potential liability on the facts known to the [insured is] shown to exist, culminating in a settlement in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the [insured]." *Id.*

Expanding on the applicable standard of reasonableness and good faith required of settlement agreements, the Third Circuit, in *Vargas v. Hudson County Board of Elections, et al.,* 949 F.2d 665, 674 (3d Cir.1991), held that "[i]n deciding whether a settlement is prudent and reasonable, a court must consider the risk to the settling parties. It is the extent of the defendants' exposure to liability and not mere allegations in the plaintiff's complaint that govern the appraisal of reasonableness." *Id.*

▮ As noted above, the initial burden of proving that the settlement agreement was reasonable and untainted by bad faith rests with Pennsbury. Both Pennsbury and Excelsior contend that the amount of settlement was reasonable and that the agreement was entered into in good faith. In deciding whether to settle, Pennsbury contends that it considered several factors, including that: over $1 million in claims had been cumulatively asserted against Pennsbury, (Tr. (November 17, 1996) at 10–15 to 12–8, Alexion Certification (September 4, 1996) at 6); the cost of continued litigation would be high,

(Tr. (November 17, 1996) at 7–13 to 7–14 and 9–14 to 9–19, Alexion Certification (September 4, 1996) at 6); counsel reviewed Excelsior's expert reports and found them to be credible (Alexion Certification (September 4, 1996) at 6); all of the claims were subrogation claims which meant that the damages claimed were already the result of significant compromise and not susceptible to further meaningful challenge, (Tr. (November 17, 1996) at 14–3 to 15–4 and 18–2 to 19–17, at 6; Alexion Certification (September 4, 1996) at 6); the reports from the Lawrenceville Fire Company and Fire Marshall for the County of Mercer indicated that the fire originated in Pennsbury's office suites, Marone Certification at Exhibits M (Lawrenceville Fire Company Report), N (Mercer County Fire Marshall's Report), and O (Arson/Special Investigation Report), (Tr. (November 17, 1996) at 12–9 to 12–23); the Arson/Special Investigation Unit found that the probable cause of the fire was files being stored too closely to the heaters located in the utility room of Pennsbury's office suites, (Marone Certification at Exhibit O); an independent analysis of liability, though a fire cause and origin evaluation, is no longer practicable,[15] (Alexion Certification (September 4, 1996) at 6); an independent analysis of the damages claimed would be expensive and not likely to be cost-effective in reducing the claim, (Alexion Certification (September 4, 1996) at 6); and Excelsior was not willing to forego claims other than against insurance proceeds if it were also required to compromise the amount of its claim (Alexion's September 4, 1996 Certification at 6, Excelsior's Brief at 24–25).

Conversely, American Reliance argues that Pennsbury has failed to meet its initial burden of proof that the settlement was reasonable and the product of good faith. American Reliance's arguments are founded upon the contentions that Pennsbury did not undertake any independent investigation concerning either the cause of the fire or the

---

**15.** Mr. Alexion certified that he was not retained as counsel for Pennsbury until after the fire repairs were made and it was too late to retain experts to determine the cause and origin of the fire. (Alexion Certification (September 4, 1996 at 5)). Furthermore, because American Reliance

had denied coverage, it had not undertaken any investigation into the cause and origin of the fire either. *Id.* Thus, Pennsbury was compelled to rely upon the reports from the public employees who had conducted the fire inspections and the reports of Excelsior's experts. *Id.*

amount of Kaylor's losses. In addition, American Reliance points out that Pennsbury did not try to compromise Excelsior's claim. As such, American Reliance proposes that Pennsbury has failed to satisfy its threshold burden.

As a preliminary matter, this court finds that Pennsbury has satisfied its burden of going forward with proofs that the settlement is reasonable and was entered into by Pennsbury in good faith. *Griggs, Employers Mutual, Luria,* and *Vargas,* all stand for the proposition that reasonableness and good faith require that the insured expend efforts to determine whether the claims are valid and whether the amount proposed is reflective of the injuries claimed. Here, Pennsbury has sufficiently established the basis for its good faith belief that the settlement was reasonable.

Initially, in determining that settlement was a reasonable and wise option, Pennsbury's C.E.O., Irvin Reiss, testified that he considered Pennsbury's potential liability in the context of the various reports of the fire experts. (Tr. (November 17, 1995) at 12–9 to 12–23). According to these reports, it is undisputed that the fire originated in Pennsbury's office suites. Although the actual cause is a matter of potential controversy, one of the three fire investigators attributed the cause to papers being stored too close to heaters in Pennsbury's storage room. (Marone Certification at Exhibit O). All of these reports were compiled by independent, public employees, who were not hired at the direction of Kaylor or Excelsior. Thus, the fact that Pennsbury did not hire its own expert to investigate the cause of the fire is not unreasonable.

Furthermore, Pennsbury's belief that the settlement amount was reasonable is also justifiable. The *Griggs* standard does not call for 100% accuracy, but only that in light of all of the relevant facts and upon a reasonable inquiry, the insured agreed to a settlement amount that was reasonable and entered into in good faith.

In the instant case, Pennsbury reviewed the detailed reports of several accounting experts, including Mr. Rubeck, Mr. Feinberg, and Mr. Lubitz, and two property adjusters, Mr. Wolfersberger and Mr. Rocca. (Tr. (November 17, 1995) at 14–3 to 1504). These reports included detailed inquiries into Dr. Kaylor's business losses, provided for decreases based on the percentage of uncollected revenues, took into account the actual loss of income attributable to the fire, and considered the impact of Dr. Kaylor's relocation. (See Tr. (January 22, 1996) at 7–18 to 18–4, 41–4 to 57–3, 79–2 to 87–25). Based on these detailed reports, and recognizing that all of the claims were already the result of significant compromise [16] and not susceptible to further meaningful challenge, Pennsbury reasonably concluded that it would not be cost-efficient to conduct its own independent investigation. Bearing all of these considerations in mind, Pennsbury, in good faith, elected to enter into a settlement agreement with Excelsior.

The burden thus shifts to the insured to "sustain the ultimate and major burden of demonstrating by a preponderance of evidence, that it is not liable because the settlement is neither reasonable nor reached in good faith." *Griggs,* 88 N.J. at 367, 443 A.2d 163. An unreasonable settlement amount would involve "collusive or overreaching impositions upon insurance carriers." (*Id.* at 174, 443 A.2d 163).

American Reliance contends that the settlement should be rendered void as unreasonable. Again, in making this assertion, American Reliance relies primarily on the fact that Pennsbury did not conduct any independent investigations of the claims and instead, relied upon the evaluations of Excelsior's experts and the cause and origin evaluations of the public employees. An independent investigation, according to American Reliance, would have revealed that Pennsbury may not actually be liable. Although American Reliance agrees that the reports of the Lawrenceville Fire Company and the Mercer County Fire Marshall pin-

---

**16.** Specifically, the claim originally submitted by Kaylor was reduced by $151,117.22 from $723,-

885 to $572,767.78. *See supra,* at 347.

point the origin of the fire in Pennsbury's suites, the actual cause was undetermined in these two reports.[17]

American Reliance suggests that further inquiry would have also exposed that the $521,393 figure for loss of business income proposed by Excelsior's expert was overstated. (American Reliance Brief at 22). Specifically, American Reliance insists that the actual loss of business income to Dr. Kaylor's business, based on the report of Mr. Carey, American Reliance's expert, is $332,609. *Id.* American Reliance submits that its expert, Mr. Carey, revealed major flaws in the conclusions reached by Excelsior's experts. These variances include that: Mr. Carey's review of Kaylor's accounts receivable files demonstrate 17.6% in uncollected revenues and not the 9.5 % compromise figure used by Excelsior; according to Mr. Carey, if Kaylor had relocated in the immediate area it would have suffered a loss of only $75,000 to $110,000; Excelsior's own experts opined that Kaylor's post-fire relocation to the other side of Trenton had a significant impact on Dr. Kaylor's business interruption loss; and Dr. Kaylor could have relocated to 168B Franklin Corners Road with other medical practitioners thereby continuing a symbiotic relationship, but chose not to do so. (Tr. (March 19, 1996) at 67–15 to 83–14). Therefore, American Reliance insists that the settlement agreement was both unreasonable and not the product of good faith by Pennsbury.

In making its assertion, American Reliance ignores certain pertinent information revealed by its own experts. First, American Reliance's expert, Mr. Carey, relied on a different data base of information in order to form his conclusions. Specifically, Mr. Carey used a three month sales trend history rather than a full year history, which Excelsior's experts used. (Tr. (March 19, 1996) at 99–8 to 99–24). Yet, Mr. Carey never explains why a three month sales trend, rather than a full year analysis, is a more appropriate standard to evaluate market trends. Thus, this variation in data accounts for the discrepancies in the loss of business income figures. *Id.*

Second, Mr. Carey concludes that "... a range of 75 to $110,000 ... might represent what the loss would have looked like if [Kaylor Chiropractic] had relocated in the immediate area and maintained the relationship of their existing client base and referral base." (*Id.* at 83–9 to 83–15). Relying on this assertion, American Reliance concludes that the actual loss of income attributable to the fire was only $75,000 to $100,000. (American reliance Brief at 22). In doing so, American Reliance neglects to consider its own expert's subsequent testimony on cross-examination regarding the basis for this low figure. On cross-examination, Mr. Carey conceded that he was unaware that Pennsbury was a large contributor to Kaylor's referral base and that Pennsbury had moved to Pennsylvania after the fire. (Tr. (March 19, 1996) at 92–14 to 92–19). Thus, even if Kaylor had remained in the immediate area, its primary referral base,[18] Pennsbury, who had moved out of the geographic area, would not be able to maintain its prior close referral relationship with Kaylor (*Id.* at 91–12 to 91–17). Mr. Carey agreed that, had he known this information,

---

**17.** American Reliance insists that it is possible that Pennsbury's negligence may not have been the sole cause of Kaylor's property damage. (American Reliance Brief at 28). American Reliance proposes that the landlord's potential negligence in failing to provide a fire alarm and sprinkler system to confine the fire to its origin area may have also been a likely cause of the excessive damage to Kaylor's property. *Id.* However, this Court finds no credible evidence in any of the expert reports that substantiates this finding.

**18.** Dr. Kaylor testified that approximately 90% of his practice is based on patient referrals. (Tr. (March 19, 1996) at 30–8 to 30–10). These referrals came largely from attorneys as well as Pennsbury. (*Id.* at 31–4 to 32–2). Prior to the fire, Pennsbury and Kaylor Chiropractic had a "symbiotic relationship". As such, both Pennsbury and Kaylor would refer patients to each other and attorneys would refer patients to them jointly. *Id.* This relationship was disrupted by the fire, when both Pennsbury and Kaylor Chiropractic relocated to different geographic areas— Pennsbury to Pennsylvania and Kaylor Chiropractic to Trenton. (*Id.* at 31–4 to 32–23). Pennsbury and Kaylor Chiropractic resumed this symbiotic relationship when they returned to a temporary facility in Lawrenceville, some time in February, 1993. *Id.*

it may have impacted his analysis. (*Id.* at 92–14 to 92–19).

Third, American Reliance placed significant weight upon Mr. Heddon, a realty expert, who opined that Kaylor could have easily relocated in the immediate area to one of several available spaces. (*Id.* at 48–15 to 48–21). However, in making this assessment, Mr. Hedden conceded that he neglected to appreciate Kaylor Chiropractic's individual needs, including specialized electrical equipment and x-ray machines. (*Id.* at 52–19 to 60–6). He also failed to appropriate additional start up costs for construction and modification of the available space to accommodate Kaylor's specialized medical needs.[19] *Id.*

Finally, American Reliance claims that liability remains uncertain. As already mentioned, it is undisputed that the fire originated in the office suites owned by Pennsbury. American Reliance argues that since the cause of the fire was not conclusively determined at the time of the Lawrenceville Fire Company's report, if Pennsbury had investigated the incident, Pennsbury may have been relieved of liability. However, all of the available evidence indicates that the fire was ignited by stored paper goods that were in close proximity to heaters, (Mercer County Fire Marshall Report (12/16/92) attached to Marone Certification at Exhibit N). More-

over, at this point, further investigation is no longer practicable. *See supra*, at 356, n. 15.

In sum, Pennsbury has satisfied its burden to prove, *prima facie*, that the settlement was both reasonable and entered into in good faith. In making its decision to settle, Pennsbury reviewed all of the expert reports, specifically determined that independent investigation would be futile, studied the monetary claims, concluded that the settlement amount sought by Excelsior was fair as it was already the result of significant compromise, and balanced all of its competing interests. Having satisfied its burden, the burden then shifted to American Reliance, which failed to satisfy its ultimate burden of establishing that Pennsbury's decision to enter into the settlement was unreasonable and tainted by bad faith. While American Reliance raised questions as to whether Pennsbury's efforts were optimum, these concerns do not rise to the level of unreasonableness required under the *Griggs* standard. Indeed, even if Pennsbury did not expend its "best efforts" in arriving at the settlement, it certainly did not act in bad faith and American Reliance has failed to satisfy its heavy burden of persuasion.

This decision is in accord with the public policy concerns that the New Jersey Supreme Court addressed in *Griggs*. It is well-settled that an insured justifiably relies upon the insurer's duty to control the defense under an insurance policy.[20] *Griggs*, 88 N.J. at

---

**19.** According to Mr. Heddon's market study there were several available spaces in the immediate vicinity of the Franklin Corners Office where Dr. Kaylor could have potentially relocated his practice. (Tr. (March 19, 1996) at 48–15 to 48–21). However, Mr. Hedden admitted that in analyzing these available spaces, he failed to take into account Dr. Kaylor's special needs as a Chiropractic physician. (*Id.* at 52–19 to 53–4). Mr. Hedden further conceded that in order to accommodate these needs, a landlord would require a minimum of two weeks to make the necessary adjustments and renovations after all of the requisite construction permits were obtained and the work approved. (*Id.* at 63–22 to 64–10). Thus, according to American Reliance's expert, though relocation in the immediate area might have potentially avoided loss of some of Dr. Kaylor's patient base, costs due to construction and delays would have escalated.

Dr. Kaylor recognized this option of moving within the vicinity of the Franklin Corners Offices, but was overwhelmingly concerned about the immediate needs of his patients who could

possibly have been harmed by delays in treatment. (*Id.* at 11–9 to 11–11 and 24–14 to 25–2). As a result, Dr. Kaylor opted, with Excelsior's approval, to relocate to a Trenton building which he owned and had previously used as an office, and was equipped with an x-ray machine. (*Id.* at 24–24 to 25–5). Although adjustments had to be made to Dr. Kaylor's Trenton offices, all of the necessary approvals and renovations were accomplished within the one week between the fire and when the doctor began seeing patients again. (*Id.* at 25–6 to 26–14). However, the most telling evidence of Dr. Kaylor's willingness to locate in Franklin Corners as soon as practicable is the fact that he moved back to temporary space in Franklin Corners as soon as such space was outfitted for his needs. (*Id.* at 32–17 to 32–23).

**20.** The court, in *Griggs*, discussed the public policy rationale behind the doctrine of estoppel which, in certain circumstances, prevents an insurance carrier from asserting the inapplicability of insurance to a particular claim. *Griggs*, 88 N.J. at 356, 443 A.2d 163. The court stated:

356, 443 A.2d 163. In failing to assume this responsibility, "it would in effect [leave] its insured defenseless or seriously hampered in its ability to protect itself." *Id.* As a result, "[a]n insured tortfeasor should be able to reach an agreement relieving it of liability when its carrier wrongfully declines to defend. In this way an insured is able to retain the protection of its insurance, while the injured party obtains a potential remedy against the insurer who has wrongfully removed itself from the suit." *Id.* at 370, 443 A.2d 163.

 Finally, that American Reliance is now obligated to defend this action, pursuant to Judge Fisher's decision, does not give it an independent or superior right, under the *Griggs* standard, to repudiate the settlement agreement. Initially, Pennsbury turned to its insurer, American Reliance, to defend against all claims. At the time, American Reliance refused to defend, leaving Pennsbury to protect itself against all of the claims being asserted against it by Excelsior. While this action was pending, Pennsbury filed a third party declaratory judgment action against American Reliance seeking a determination that the third party defendants have a duty to defend. Subsequently, Pennsbury, represented by its own counsel, entered into a binding settlement agreement with Excelsior, whereby Pennsbury was exonerated of all liability in exchange for an assignment of Pennsbury's interest in the third party action against American Reliance. After the parties had finalized the agreement and completed the first day of the *Griggs* hearings, Judge Fisher held that American Reliance had a duty to defend Pennsbury in this action.

> The rationale behind estoppel in this context is that once the insurer has acknowledged the claim and assumes control of the defense, the insured is justified in relying upon the carrier to protect it under its policy and to be responsible for any judgment against it. The insured's justifiable reliance arises from the insurer's contractual right to control the defense under the policy. In assuming this contractual right of control, the insurer preempts its insured from defending itself. If the insurer could later repudiate its responsibility and ultimate liability under the policy, it would in effect have left its insured

The question then arises, can American Reliance now assume responsibility over Pennsbury's defense and attempt to relieve Pennsbury from the settlement agreement which was entered into on April 21, 1995, but not yet formally approved by the court pursuant to *Griggs?* Having already concluded that the settlement agreement was binding and enforceable on the parties on April 21, 1995, the answer is clear. When Judge Fisher ruled that American Reliance is obligated to defend Pennsbury, American Reliance became obligated to assume Pennsbury's defense in this matter and stood in Pennsbury's shoes. At the time of Judge Fisher's ruling in November, 1995, Pennsbury had already entered into a binding agreement with Excelsior. Although the agreement required court approval pursuant to *Griggs,* the parties were nonetheless bound by it barring this Court's veto.

Moreover, despite Judge Fisher's determination that American Reliance was obligated to defend Pennsbury, American Reliance continued to challenge this obligation. American Reliance filed a motion for reconsideration of Judge Fisher's Order on December 6, 1996. Thus, American Reliance gave Pennsbury and this Court no assurance that it would assume its obligation to defend until it exhausted its legal remedies. On January 16, 1996, while the *Griggs* hearings were proceeding on schedule, Judge Fisher denied the motion for reconsideration. American Reliance's continued failure to provide a timely defense to its insured makes Pennsbury's decision to settle with Excelsior eminently reasonable under the *Griggs* standard.

> defenseless or seriously hampered in its ability to protect itself. *Id.* (citation omitted). This reasoning is instructive in the context of the present insurance claim as it invokes similar public policy concerns. *See also Kleckner v. Mutual Life Insur. Co. of New York,* 822 F.2d 1316, 1318 (3d Cir.1987) ("The courts of New Jersey have long adhered to the principle that insurance policies are not ordinary contracts, but are contracts of adhesion between parties who are not equally situated.... [W]ith such contracts New Jersey courts have given effect to the objectively reasonable expectations of the insured.").

*Conclusion*

Based upon the foregoing, American Reliance's motion to set aside the settlement agreement between Pennsbury and Excelsior is hereby denied. An appropriate Order shall follow.